UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 21-941 JGB (KKx)** | Date | April 27, 2023 |
|---|---|---|---|
| Title | ***Fair Housing Council of Riverside County, Inc. et al. v. Group XIII Properties LP, et al.*** | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**     **Order (1) GRANTING Moving Defendants' Motion for Summary Judgment (Dkt. No 51); and (2) VACATING the May 1, 2023 Hearing**

Before the Court is a motion for summary judgment filed by Defendants Swaranjit (Mike) Nijjar and Daljit Kler ("Moving Defendants"). ("MSJ," Dkt. No. 51.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of, and in opposition to, the MSJ, the Court GRANTS the MSJ. The May 1, 2023 hearing is VACATED.

## I.  BACKGROUND

On June 2, 2021, Plaintiffs Fair Housing Council of Riverside County, Inc. and James Beasley filed a complaint against Defendants Group XIII Properties LP, Group XIII Properties, Inc., Swaranjit (Mike) Nijjar and Elisa Valerio. ("Complaint," Dkt. No. 1.) On March 4, 2022, Plaintiffs filed a first amended complaint against Defendants Group XIII Properties LP, Group XIII Properties, Inc., Swaranjit (Mike) Nijjar, Elisa Valerio, DHA Opportunity 1, LP, DHA Opportunity 1, Inc., and Daljit Kler. ("FAC," Dkt. No. 32.) Plaintiffs bring seven causes of action against all Defendants: (1) violation of the Fair Housing Act (FHA), 42 U.S.C. §§ 3604(a); (2) violation of the Fair Housing Act, 42 U.S.C. §§ 3604(c); (3) violation of the Fair Housing Act, 42 U.S.C. §§ 3604(d); (4) violation of 42 U.S.C. § 1982; (5) violation of the California Fair Employment and Housing Act (FEHA); (6) negligence; and (7) defamation. (See id.)

On January 19, 2023, Plaintiffs filed a motion to compel further responses to requests for production. ("Motion to Compel," Dkt. No. 38.) On February 6, 2023, Magistrate Judge Kiya Kato issued an order granting in part and denying in part Plaintiffs' Motion to Compel.

("Discovery Order," Dkt. No. 41.)  On February 20, 2023, Moving Defendants filed an ex parte application to partially stay the Discovery Order pending resolution of a motion for summary judgment and motion to bifurcate.  ("Application for Partial Stay," Dkt. No. 45.)  On February 28, 2023, the Court denied the Application for Partial Stay.  ("Order Denying Application for Partial Stay," Dkt. No. 50.)

On March 6, 2023, Moving Defendants filed the MSJ.  (MSJ.)  In support of the MSJ, Defendants filed the following documents:

- Declaration of Swaranjit (Mike) Nijjar ("Nijjar Declaration," Dkt. No. 51-1);
- Declaration of Daljit Kler ("Kler Declaration," Dkt. No. 51-2); and
- Declaration of Elisa Valerio ("Valerio Declaration," Dkt. No. 51-3).

The same day, Moving Defendants filed a separate statement of uncontroverted facts and conclusions of law.  ("DSSUF," Dkt. No. 52.)

Between March 20, 2023 and March 22, 2023, Plaintiffs filed successive applications for extensions of time to file an opposition to the MSJ.  (See Dkt. Nos. 53, 55, 56, 58.)  On March 22, 2023 and March 23, 2023, the Court granted the applications, ultimately extending the deadline for Plaintiffs to file an opposition to March 27, 2023.  (See Dkt. Nos. 57, 59.)

On March 27, 2023, Plaintiffs filed an opposition to the MSJ.  ("Opposition," Dkt. No. 61.)  In support of the Opposition, Plaintiffs filed 17 exhibits as attachments to the Opposition.  (See Dkt. Nos. 61-1-17.)  In support of the Opposition, Plaintiffs also filed 79 additional exhibits.  ("Plaintiffs' Compendium of Exhibits," Dkt. No. 60.)

On March 27, 2023, Plaintiffs filed a statement of genuine disputes and additional material facts in opposition to the MSJ.  ("PSGDMF," Dkt. No. 62; "PAMF," Dkt. No. 62.)  The same day, Plaintiffs filed a request for judicial notice.  ("RJN," Dkt. No. 63.)

On April 3, 2023, Moving Defendants replied in support of the MSJ.  ("Reply," Dkt. No. 64.)  The same day, Moving Defendants filed a response to Plaintiffs' opposition to separate statement of uncontroverted material facts and Plaintiffs' additional material facts.  ("DSSUF Reply," Dkt. No. 65.)  Also on April 3, 2023, Moving Defendants opposed the RJN.  ("RJN Opposition," Dkt. No. 66.)  The same day, Moving Defendants also filed evidentiary objections to Plaintiffs' compendium of evidence and declarations in support of their opposition to the MSJ.  ("Defendants' Evidentiary Objections," Dkt. No. 67.)

On April 7, 2023, Plaintiffs filed a response to Defendants' Evidentiary Objections.  ("Plaintiff's Response to Defendants' Evidentiary Objections," Dkt. No. 68.)

On April 14, 2023, the Court continued the hearing on the MSJ from April 17, 2023 to April 24, 2023.  (Dkt. No. 69.)  On April 21, 2023, the Court continued the hearing on the MSJ from April 24, 2023 to May 1, 2023.  (Dkt. No. 70.)  On April 24, 2023, Plaintiff filed an

unopposed application for an extension of time to complete a settlement conference.  (Dkt. No. 71.)

## II.  FACTS

### A.  Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. P. 56(e).  At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial.  See Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  The Court considers the parties' objections only where necessary; all other objections are OVERRULED AS MOOT.

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here.  Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").  The Court briefly explains its rulings on a few such categories of evidence: Moving Defendants object to numerous pieces of evidence submitted by Plaintiffs, including seemingly any use of deposition testimony (or exhibits to deposition testimony) of Swaranjit Nijjar, Everet Miller and/or Daljit Kler taken in other cases on relevance grounds.  (See Defendants' Evidentiary Objections ¶¶ 3-6, 9, 22-26, 34, 75.)  As set out below, the Court finds some of this evidence relevant to the instant dispute, in that it pertains to the ownership structure of the relevant entities and the involvement of Moving Defendants in these entities.  Moreover, the fact that the depositions were taken in related lawsuits does not render them inadmissible.  Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001).  Further, the individuals who testified in these depositions appear to have done so as designated agents of the corporate entities relevant here and are admissible as statements of party-opponents.  See Fed. R. Evid. 801(d)(2)(A), (C).  The subject of the MSJ is to what extent Moving Defendants can be liable as individuals for the acts of employees of these corporate entities; as noted below, the Court finds some of this evidence relevant to that dispute.  Moving Defendants also object to miscellaneous pieces of evidence, including grant deeds transferring title of real property, on relevance grounds.  (See, e.g., id. ¶¶ 12-13.)  Once again, the Court finds this evidence surpasses the low threshold of relevant evidence.  Nonetheless, as set out in detail below, the Court does not find much of Plaintiffs' evidence particularly germane to the issues discussed below, and does not rely upon much of it.  The Court OVERRULES Moving Defendants' relevance objections for any piece of evidence relied upon below; all other objections are OVERRULED AS MOOT.

The Court denies some of the parties' objections as "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence."  Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009); Amaretto Ranch Breedables v. Ozimals Inc., 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development"); Communities Actively Living Indep. & Free v. City of Los Angeles, 2011 WL 4595993, at *8 (C.D. Cal. Feb. 10, 2011) (summarily overruling boilerplate evidentiary objections when the grounds for the objections were unduly vague and overbroad).  The Court overrules virtually all of the parties' personal knowledge and foundation objections; except where otherwise noted, the evidence relied upon in the order below has a sufficient basis in personal knowledge and foundation to be considered.

Most of the parties' hearsay objections are likewise overruled.  Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial.  Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004).  Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay."  Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004).  Moving Defendants object to various pieces of evidence, including deposition testimony of Everet Miller, limited partnership agreements produced by Defendants in discovery, a property management agreement, documents from Elisa Valerio's employment file, an employment agreement, and complaints filed in other cases on hearsay grounds.  (Defendants' Evidentiary Objections ¶¶ 3, 5, 6, 10, 11, 29, 30, 31, 32, 36, 37, 38, 41, 43.)  The Court OVERRULES these objections because they are not hearsay or an exception to the hearsay rule applies, such as a statement of a party-opponent or the business or public records exception.  See Fed. R. Evid. 801(d)(2); 803(6); 803(8); 803(14); 803(15); in the alternative, the evidence could be admissible under the residual hearsay exception.  See Fed. R. Evid. 807.  As noted below, the Court also does not take judicial notice of certain court filings (such as complaints) for their truth, as that is not the purpose for which Plaintiffs seek their admission; rather, the filings are admitted to prove knowledge of their existence by Moving Defendants and/or related corporate entities and their response to them, or lack thereof.  The Court OVERRULES these hearsay exceptions for any piece of evidence relied upon below; all other such objections are OVERRULED AS MOOT.

Moving Defendants frequently object to evidence on grounds of unfair prejudice because "Plaintiffs attempt to malign Defendants' reputation in this case by citing unrelated lawsuits involving entities that are not involved in this case."  (See, e.g., Defendants' Evidentiary Objections ¶ 39.)  First of all, that is not Plaintiffs' purpose in seeking the admission of these documents.  While the Court does not find them particularly probative of the legal issues presented here, as discussed below, they also pose no danger of unfair prejudice because this Court is quite capable of distinguishing between the proper and improper use of such evidence.  The calculus might be different at trial, and if this case is presented to a jury, Defendants could renew an objection to the use of other lawsuits (such as habitability cases) through a motion in limine.  See Montoya v. Orange Cnty. Sheriff's Dep't, 987 F. Supp. 2d 981, 994 (C.D. Cal. 2013) (Bernal, J.) (explaining that a court need not exclude evidence at the summary judgment stage on

grounds of unfair prejudice, confusion of the issues or other Rule 403 objections and that such objections are properly raised before trial); Holt v. Noble House Hotels & Resort, Ltd, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) ("Moreover, Federal Rule of Evidence 403 objections are unnecessary at the summary judgment stage because there is no jury that can be misled and no danger of confusing the issues."). Moving Defendants' prejudice objections are OVERRULED.

## B. Request for Judicial Notice

Plaintiffs request judicial notice of the following documents:

### 1. Public Records on Government Websites

- The public license lookup page of the State of California Department of Real Estate website, https://www2.dre.ca.gov/PublicASP/pplinfo.asp (Plaintiffs' Compendium of Evidence Exs. 7, 27, 51, 54, 57, 60, 63, 72, 73, 74);
- The business search page of the State of California Secretary of State website, https://bizfileonline.sos.ca.gov/search/business (Plaintiffs' Compendium of Evidence Exs. 21, 28, 47, 50, 53, 56, 59, 65, 67, 68, 76, 77);
- The business entity lookup page on the website maintained by the Nevada Secretary of State, https://www.nvsilverflume.gov (Plaintiffs' Compendium of Evidence Exs. 8, 46, 49, 52, 55, 58, 61, 64);
- The official record search page of the website maintained by the Office of the Assessor-County Clerk-Recorder of the County of Riverside, https://webselfservice.riversideacr.com (Plaintiffs' Compendium of Evidence Exs. 12, 13, 15, 16, 17, 18, 66);
- The official record search page of the website maintained by the Office of the Assessor-Recorder-Clerk of the County of San Bernardino (Plaintiffs' Compendium of Evidence Exs. 14, 20, 39, 40);
- The website maintained by the U.S. Department of Housing and Urban Development, http://archives.hud.gov/news/2019.cfm (Plaintiffs' Compendium of Evidence Ex. 40).

### 2. Court Records

- Declaration of Sherri Wilson filed in Kelley v. Pama Management, Inc. et al., the Los Angeles Superior Court No. 21STCV08389 (Plaintiffs' Compendium of Evidence Ex. 33);
- Declaration of LAPD Senior Lead Officer Carol Sawamura filed in State v. Group IX BP Properties, LP, Los Angeles Superior Court No. 22STCV05624 (Plaintiffs' Compendium of Evidence Ex. 41);
- Order re: Motion for Preliminary Injunction in State v. Group IX BP Properties, LP, Los Angeles Superior Court No. 22STCV05624 (Plaintiffs' Compendium of Evidence Ex. 42);
- Complaint for Damages for Common Counts in Bouzane v. Nijjar, et al., Los Angeles Superior Court No. 22STCV38447 (Plaintiffs' Compendium of Evidence Ex. 79);

- Complaint filed in <u>Lamkin et al. v. Group III SGV Properties and Group III Properties LP</u>, Riverside Superior Court No. MCC1700449 (Plaintiffs' Compendium of Evidence Ex. 36);
- Action for Damages in<u> Cluck et al. v. IE Rentals, LLC and Pama Management, Inc.</u>, San Bernardino Superior Court No. 19CIVDS 1924730 (Plaintiffs' Compendium of Evidence Ex. 37);
- Complaint in <u>Brown v. Starlite Mgmt - VI, LP, Pama Management, Inc. and IE Rental Homes</u>, San Bernardino Superior Court No. 19CIVDS 1924481 (Plaintiffs' Compendium of Evidence Ex. 38);
- Complaint in <u>Lopez v. Pama Management, Inc.</u>, United States District Court for the Central District of California Case No. 2:16-CV-9390-ODW-JCx (Plaintiffs' Compendium of Evidence Ex. 78).

### 3. Other Public Records

- Certified copies from the Nevada Secretary of State re: Pro Management Company Inc. (Plaintiffs' Compendium of Evidence Ex. 8);
- In the matter of the <u>Accusation of: Nijjar Realty Inc, etc. et al., California Department of Real Estate Decision</u>, Case No. H-41000 LA, OAH No. 2018050393 (Plaintiffs' Compendium of Evidence Ex. 45).

(<u>See</u> RJN.)  Moving Defendants object to all these documents, except for Exs. 8 and 45.  (<u>See</u> RJN Opposition.)

The Court may take judicial notice of matters that are either (1) generally known within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).

The Court finds that the public records, including those maintained on the government websites listed above, are subject to judicial notice.  <u>See</u> <u>Johnson v. DBTA, LLC</u>, 424 F. Supp. 3d 657, 662 (N.D. Cal. 2019); <u>Gerritsen v. Warner Bros. Ent. Inc.</u>, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015); <u>Michery v. Ford Motor Co.</u>, 650 Fed. App'x 338, 342 n.2 (9th Cir. 2016).  The Court thus GRANTS the RJN as to those documents.

Proceedings of other courts, including orders and filings, are the proper subject of judicial notice when directly related to the case, though not for the truth of the contents of the underlying documents.  <u>See</u> <u>United States ex. Rel. Robinson Rancheria Citizens Council v. Borneo, Inc.</u>, 917 F.2d 244, 248 (9th Cir. 1992) (courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); <u>Neilson v. Union Bank of California, N.A.</u>, 290 F. Supp. 2d 1101, 1113 (C.D. Cal. 2003) ("court orders and filings are the type of documents that are properly noticed under [Fed. R. Evid. 201(b).]"); <u>Reyn's Pasta Bella, LLC v. Visa USA, Inc.</u>, 442 F.3d 741, 746 n.6 (9th Cir. 2006).  As such, the Court GRANTS the RJN as to Plaintiffs' Compendium of Evidence Exs. 33, 36-38, 41, and 78.  The Court agrees with Moving Defendants that the truth of the

underlying contents of these filings, including the Declaration of Sherri Wilson and Declaration of Carol Sawamura, is not the proper subject of judicial notice, and the Court DENIES the RJN as to those documents.  The Court also agrees with Moving Defendants that Plaintiffs' Compendium of Evidence Ex. 42 is not subject to judicial notice, for Plaintiffs do not appear to ask the Court to take judicial notice of a fact; moreover, the Court does not find the document relevant.  The Court DENIES the RJN as to that document.  The Court does not necessarily agree with Moving Defendants' objections to Plaintiffs' Compendium of Evidence Ex. 79, but it also does not find the document relevant, so the Court DENIES the RJN AS MOOT as to that document.  For the reasons stated above and below, the Court OVERRULES Moving Defendants' objections that Plaintiffs' Compendium of Evidence Exhibits 42, 36, 37, 38 and 78 are irrelevant because they likely have some marginal relevance; nonetheless, the Court does not find them material to the issues discussed below.

## C.  Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the MSJ.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.[1]

### 1.  Interaction Between Ms. Valerio and Mr. Beasley; Communications Between Ms. Valerio and Moving Defendants Regarding Mr. Beasley

Defendant Elisa Valerio was employed by Pro Management, Inc. as the onsite property manager at Villa La Paz apartments, located at 675 S San Jacinto St., Hemet, CA 92543, between on or about January 1, 2020 and March 31, 2021.  (DSSUF ¶ 1.)  Defendant Valerio met and communicated with Plaintiff James Beasley, an African American man, between on or about April 23, 2020 and May 12, 2020 in connection with Mr. Beasley's rental application for a unit at Villa La Paz apartments.  (Id. ¶ 2.)  Having previously given his 30-day notice to his landlord, Mr. Beasley was anxious to find a new place to rent in Hemet.  (PAMF ¶ 1.)  Ms. Valerio told Mr. Beasley that she would have apartments available for rent during the first week in May.  (Id. ¶ 2.)  Mr. Beasley submitted an application for unit 12, along with the documents Ms. Valerio told him were required and a money order for the credit check.  (Id. ¶ 3.)  On May 5, 2020, Ms. Valerio texted Mr. Beasley and told him that his application had been approved and that he could come see the apartment.  Later that day, Mr. Beasley went to the Villa La Paz Apartments to meet with Ms. Valerio and inspect the available apartment.  (Id. ¶ 4.)  Ms. Valerio showed Mr. Beasley the available apartment; Ms. Valerio was accompanied by a man whom Mr. Beasley understood to be Ms. Valerio's husband.  (Id. ¶ 5.)  Upon inspecting the apartment, Mr. Beasley saw that it was

---

[1] Moving Defendants have responded to numerous facts in the PAMF with a statement that they are "undisputed by Nijjar or Kler."  (See DSSUF Reply.)  The Court follows this limited concession; the facts that follow are deemed undisputed with regard to the only Defendants relevant to the MSJ, Mr. Nijjar and Ms. Kler.  The Court anticipates that other Defendants may dispute some or all of these facts at a later date; they are not bound by the concessions made here.

dirty and not in move-in condition.  Mr. Beasley expressed concern to Ms. Valerio that the apartment was not ready and that items needed cleaning or repair; Ms. Valerio said the apartment would be ready by Saturday, May 9, 2020.  (Id. ¶¶ 6-7.)

As noted below, it is disputed whether Ms. Valerio used a racial slur on May 5, 2020 that Mr. Beasley overheard.

On the evening of May 6 or 7, 2020, Mr. Beasley returned to the Villa La Paz apartments and observed that the unit he had previously inspected was in unchanged condition.  (Id. ¶ 9.)  On May 8, 2020, Mr. Beasley texted Ms. Valerio and asked her if there were any apartments ready to rent.  Ms. Valerio texted Mr. Beasley the address of an apartment located at 145 N. Inez St. in Hemet, CA.  Mr. Beasley knew that area and did not want to live there.  (Id. ¶ 11.)  The Inez St. apartments were at that time owned by Swaranjit Nijjar's son, Michael Nijjar.  (Id.)

Later on May 8, 2020, Mr. Beasley texted Ms. Valerio and asked her if he could bring the $800 deposit for the La Paz apartment and pay the first month's rent when the apartment was ready for move-in.  Ms. Valerio replied that the apartment had been rented.  (Id. ¶ 12.)  While the parties dispute whether this was the reason Mr. Beasley was denied the apartment, it is undisputed that Mr. Beasley did not pay the required security deposit and first month's rent to reserve the apartment.  (DSSUF ¶ 4.)

Mr. Beasley asked two friends to text Ms. Valerio to inquire about available apartments at Villa La Paz.  (PAMF ¶ 13.)  One friend texted Ms. Valerio on May 11, 2020 asking about apartments for rent at Villa La Paz; Ms. Valerio texted back that a unit was available.  Later that day, Mr. Beasley texted Ms. Valerio asking if any apartments were available at Villa La Paz.  Ms. Valerio replied that they had already been rented.  (Id. ¶¶ 13-14.)  Another friend of Mr. Beasley's texted Ms. Valerio on May 12, 2020, asking about apartments for rent at Villa La Paz; Ms. Valerio responded that a unit was available.  Later that same day, Mr. Beasley texted Ms. Valerio asking if and when any apartments would be available at Villa Paz; Ms. Valerio texted back that she did not have anything available.  (Id. ¶ 15.)

Ms. Valerio was the employee of Pro Management Company when she was the manager of the Villa La Paz apartments during the period January 1, 2020 to May 3, 2021.  (Id. ¶ 16.)  While she was employed by Pro Management Company as manager of the Villa La Paz Apartments, Ms. Valerio's duties included communicating with prospective tenants and handling rental applications.  (PAMF ¶¶ 105-111.)

Defendant Valerio never communicated with or received direction from Defendant Swaranjit (Mike) Nijjar or Defendant Daljit Kler related to Plaintiff Beasley or Plaintiff Beasley's application to rent a unit at Villa La Paz.  (DSSUF ¶ 6.)  Neither Defendant Nijjar nor Defendant Kler were aware of Plaintiff Beasley's application for a rental unit at the Villa La Paz apartments at the time it was filed or reviewed.  (Id. ¶ 7.)

//

**2. Roles Held by Defendants Nijjar and Kler; Corporate Structures and Ownership of Property**

Swaranjit "Mike" Nijjar was President and Chief Executive Officer of a company called Group XIII Properties, Inc. from on or about May 19, 2014 to on or about April 27, 2022. (DSSUF ¶ 8.)  Defendant Nijjar was also a Director of Group XIII Properties, Inc. from on or about May 3, 2019 to on or about April 27, 2022.  (Id. ¶ 9.)  Defendant Nijjar resigned as CEO and Director of Group XIII Properties, Inc. on or about April 27, 2022.  (Id. ¶ 10.)

Group XIII Properties, Inc. is the general partner of a property-holding limited partnership called Group XIII Properties, LP.  (Id. ¶ 11.)  Group XIII Properties, LP purchased the Villa La Paz apartments on or about November 27, 2018.  (Id. ¶ 12.)  In 2020, Group XIII Properties, LP owned 60 properties, and it did not—nor does it currently—perform any property management services or have any employees.  (Id. ¶ 13.)  Group XIII Properties, LP contracts with Pro Management, Inc. to perform property management services at many of its properties, including Villa La Paz apartments.  (Id. ¶ 14.)  On or about July 29, 2021 or July 30, 2021, Group XIII Properties, LP transferred the Villa Paz apartments to DHA Opportunity 1, LP.  (Id. ¶ 15; PSGDMF ¶ 15.)

Daljit Kler has been President, Secretary, Treasurer and Director of DHA Opportunity 1, Inc. since on or about May 3, 2019.  (DSSUF ¶ 16.)  DHA Opportunity 1, Inc. is the general partner of a property holding limited partnership called DHA Opportunity 1, LP.  (Id. ¶ 17.)  In 2020, DHA Opportunity 1, LP owned 20 properties, comprising 57 units, and it did not, nor does it currently, perform any property management services or have any employees.  (Id. ¶ 18.)  DHA Opportunity 1, LP contracts with Pro Management, Inc. to perform property management services at many of its properties, including Villa La Paz apartments.  (Id. ¶ 19.)  DHA Opportunity 1, LP currently owns the Villa La Paz apartments.  (Id. ¶ 20.)

Mr. Nijjar obtained his real estate broker's license and incorporated Nijjar Realty, Inc. in the late 1970s, opening his business at 4900 Santa Anita Avenue in El Monte, CA ("the El Monte Office").  (PAMF ¶ 17.)  As of 2011, the owners of Nijjar Realty, Inc. were Mr. Nijjar, his sister Ms. Kler, and Mr. Nijjar's three sons, Sanjeet, Sabraj and Michael Nijjar.  (Id. ¶ 18.)  As of 2011, Pama Management Company was a DBA of Nijjar Realty, Inc.  (Id. ¶ 19.)  Pama Management Company was responsible for managing the properties in which Mr. Nijjar had an ownership interest.  (Id. ¶ 20.)  In 2015, Pama Management, Inc. was formed as a separate corporation to separate Mr. Nijjar and Ms. Kler's purchase and sales activities from their property management activities.  (Id. ¶ 21.)  Mr. Nijjar is the majority shareholder of Pama Management, Inc.  There are four other shareholders.  (Id. ¶ 22.)  For several years, ending sometime in 2019, I E Rental Homes was a DBA of Pama Management, Inc. (Id. ¶ 23.)  Both Mr. Nijjar and Ms. Kler are licensed real estate brokers.  (Id. ¶ 24.)

//
//
//

### 3. Nijjar Family Control over Ownership and Management of Buildings

In 2018, in his capacity as CEO and Chairman of the Board of Pama Management, Inc., Everet Miller submitted a declaration and was deposed in <u>Jones v. Group XIV BP Properties, LP</u>, San Bernardino Superior Court No. CIVDS1802102. (<u>Id.</u> ¶ 25.) Mr. Miller declared or admitted the following facts in his declaration or deposition testimony: As of August 1, 2018, Mr. Miller was CEO and Chairman of the Board of Pama Management, Inc. Daljit Kler was the President and CEO of PAMA. (<u>Id.</u> ¶ 26.) The Nijjar family holds ownership of a real property through a limited partnership formed for that purpose. (<u>Id.</u> ¶ 27.) The general partner of the limited partnership is a corporation, usually with a name similar to that of the limited partnership. The other partner is the Nijjar Family Trust. (<u>Id.</u> ¶ 28.) The shareholders of the corporation serving as the general partner would also be members of the Nijjar family. (<u>Id.</u> ¶ 29.) Neither the limited partnership nor the corporation have employees. (<u>Id.</u> ¶ 30.)

The share of profits and losses of the limited partnership is usually 1 to 3 percent to the general partner corporation and the remainder to the Family Trust. (<u>Id.</u> ¶ 31.) As of 2018, in the normal course of business, there would be a Property Management Agreement between Pama and the limited partnership owning the property. (<u>Id.</u> ¶ 32.) For some period of time, Pama Management managed Nijjar properties throughout Southern California. (<u>Id.</u> ¶ 33.)

Ms. Kler oversaw Pama Management's operations. She was assisted by her Chief of Staff, Jesse Carrillo. (<u>Id.</u> ¶ 35.) Pama Management employed resident managers at its properties who worked under area supervisors. (<u>Id.</u> ¶ 36.) Pama Management area supervisors reported to Daljit Kler and she conducted meetings with them almost weekly. (<u>Id.</u> ¶ 37.) While Moving Defendants dispute that Ms. Kler has supervised any managers directly relevant to the instant case, it is undisputed that Ms. Kler has met on-site managers at properties generally. (<u>Id.</u> ¶ 38; DSSUF Reply ¶ 38.) For instance, Ms. Kler regularly visited the Pama office in San Bernardino on Tuesdays and Thursdays and sometimes attended the regularly scheduled managers' meeting when she was there. (PAMF ¶ 38.)

While Moving Defendants dispute "any inference that Kler has evaluated Valerio or other Pro Management individuals relevant to this matter," it is undisputed that Ms. Kler gives performance evaluations of supervisors generally. (<u>Id.</u> ¶ 39; DSSUF Reply ¶ 39.)[2] Sherri Wilson, Director of Human Resources for Pama Management, Inc. and I E Rental Homes, Inc., is responsible for training and giving performance evaluations of property managers and for hiring, firing and disciplining employees that she supervises. (PAMF ¶ 40.)

//
//

---

[2] The Court does not rely upon the Declaration of Sherri Wilson for this fact; it relies upon Plaintiffs' Compendium of Evidence Ex. 75, the Deposition of Daljit Kler taken on May 24, 2019 in <u>Reina v. Group VIII Properties, LP</u>, which the Court finds admissible as a statement of a party-opponent.

**4. Reorganization after Department of Real Estate Revoked Pama Management's Real Estate License**

On March 22, 2019, the California Department of Real Estate (DRE) revoked the real estate licenses of Nijjar Realty, Inc. and Everet Miller, the designated officer/broker of Pama Management, Inc., dba I E Rental Homes and Nijjar Realty, Inc. (Id. ¶ 41.) On April 16, 2019, Ms. Kler's Chief of Staff, Jesse Carrillo, filed Articles of Incorporation for Pro Management Company Inc. with the Nevada Secretary of State. Mr. Carrillo was identified as president and director of the corporation. (Id. ¶ 42.) The same day, Regency Management Inc. filed its Articles of Incorporation with the Nevada Secretary of State. (Id. ¶ 120.)

Since its incorporation in Nevada, Regency Management Inc. has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Chris Dumayas, and Michael Brown. Scott Steven Brown has never been listed as an officer of the corporation. (Id. ¶ 121.) Regency Management Inc. has filed two Corporate Statements of Information with the California Secretary of State doing business as Regency Management Inc. An April 22, 2020 statement lists Chris Dumayas, Jesse Carrillo, and Michael Brown as officers; its December 15, 2021 statements lists Jesse Carrillo as the sole officer. Neither statement identifies Scott Steven Brown as an officer of the corporation. (Id. ¶ 122.) On August 28, 2019, the California DRE issued a corporate real estate license to Regency Management Inc., listing its designated licensed corporate officer as Scott Steven Brown. (Id. ¶ 123.)

On April 16, 2019, Pro Management Company, Inc. filed its Initial / Annual List of Officers and Directors for the period April 2019 to April 2020, listing Jesse Carrillo as President and Director, Chris Dumayas as Secretary, and Ryan Lui as Treasurer. Scott Steven Brown was not listed as an officer or director of the corporation. (Id. ¶ 116.) Pro Management Company filed an Annual or Amended List of Officers with the Nevada Secretary of State on February 5, 2020, January 31, 2021, December 14, 2021, and January 31, 2022. (Id. ¶ 117.) Pro Management Company has filed two Statements of Information with the California Secretary of State doing business as Pro Management Company XIV, Inc. Its April 28, 2020 statement lists Chris Dunayas, Jesse Carrillo and Michael Brown as corporate officers; its December 15, 2021 statement lists Michael Brown as the sole officer. Neither statement identifies Scott Steven Brown as an officer of the corporation. (Id. ¶ 118.) On August 22, 2019, the California DRE issued a corporate real estate license to Pro Management Company XIV, Inc., listing its designated corporate officer as Scott Steven Brown and its main office as the El Monte Office. (Id. ¶ 119.)

On April 16, 2019, Equity Management Inc. filed its articles of incorporation with the Nevada Secretary of State. (Id. ¶ 124.) Since its incorporation in Nevada, Equity Management Inc. has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Chris Dumayas, Michael Brown, Ryan Lui, Jiahong Liu and Michael Nijjar. Scott Steven Brown has never been listed as an officer of the corporation. (Id. ¶ 125.) Equity Management Inc. has filed two Corporate Statements of Information with the California Secretary of State. Its January 10, 2023 statement lists Michael Brown as the sole officer; its February 27, 2023 lists Jesse

Carrillo as the sole officer.  Neither statement identifies Scott Steven Brown as an officer of the corporation.  (Id. ¶ 126.)  On August 20, 2019, DRE issued a corporate real estate license to Equity Management Inc., listing its designated licensed corporate officer as Scott Steven Brown.  (Id. ¶ 127.)

On April 16, 2019, Legacy Management Services Inc. filed its articles of incorporation with the Nevada Secretary of State.  (Id. ¶ 128.)  Since its incorporation in Nevada, Legacy Management Services Inc. has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Michael Brown and Ryan Lui.  Scott Steven Brown has never been listed as an officer of the corporation.  (Id. ¶ 129.)  Legacy Management Services Inc. has filed two Corporate Statements of Information with the California Secretary of State, doing business as Legacy Management Services Inc. XLVII.  Its February 4, 2020 statement listed Jesse Carrillo, Michael Brown and Ryan Lui as officers; its December 15, 2021 statement lists Michael Brown as the sole officer.  Neither statement identifies Scott Steven Brown as an officer of the corporation.  (Id. ¶ 130.)  On August 19, 2019, DRE issued a corporate real estate license to Legacy Management Services Inc., XLVII, listing its designated licensed corporate officer as Scott Steven Brown.  (Id. ¶ 131.)

On April 16, 2019, Hightower Management Inc. filed its articles of incorporation with the Nevada Secretary of State.  (Id. ¶ 132.)  Since its incorporation in Nevada, Hightower Management Inc. has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Chris Dumayas, Michael Brown, and Ryan Lui.  Scott Steven Brown has never been listed as an officer of the corporation.  (Id. ¶ 133.)  Hightower Management Inc. has filed two Corporate Statements of Information with the California Secretary of State, both filed on January 10, 2023.  One lists Jesse Carrillo as the sole officer; the other lists Michael Brown as the sole officer.  Neither identifies Scott Steven Brown as an officer of the corporation.  (Id. ¶ 134.)  On August 20, 2019, DRE issued a corporate real estate license to Hightower Management Inc., listing its designed licensed corporate officer as Scott Steven Brown.  (Id. ¶ 135.)

On April 16, 2019, Mobile Management Services Inc. filed its Articles of Incorporation with the Nevada Secretary of State.  (Id. ¶ 136.)  Since its incorporation in Nevada, Mobile Management Services Inc. has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Chris Dumayas, Michael Brown and Ryan Lui.  Scott Steven Brown has never been listed as an officer of the corporation.  (Id. ¶ 137.)  Mobile Management Services Inc. has filed two Corporate Statements of Information with the California Secretary of State.  Both were filed on January 10, 2023.  One lists Jesse Carrillo as the sole officer; the other lists Michael Brown as the sole officer.  Neither statement identifies Scott Steven Brown as an officer of the corporation.  (Id. ¶ 138.)  On August 20, 2019, DRE issued a corporate real estate license to Mobile Management Services Inc., listing its designated licensed corporate officer as Scott Steven Brown.  (Id. ¶ 139.)

On April 16, 2019, Bridge Management Inc. filed its articles of incorporation with the Nevada Secretary of State.  (Id. ¶ 140.)  Since its incorporation in Nevada, Bridge Management Inc. has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo,

Michael Brown, Chris Dumayas and Ryan Lui.  Scott Steven Brown has never been listed as an officer of the corporation.  (Id. ¶ 141.)  Bridge Management Inc. has filed two Corporate Statements of Information with the California Secretary of State, doing business as Bridge Management XIII.  Its December 15, 2021 statement listed Michael Brown as the sole officer; its December 20, 2021 statements also lists Michael Brown as the sole officer.  Neither statement identifies Scott Steven Brown as an officer of the corporation.  (Id. ¶ 142.)  On August 22, 2019, DRE issued a corporate real estate license to Bridge Management XIII, listing its designated licensed corporate officer as Scott Steven Brown.  (Id. ¶ 143.)  Since its incorporation in Nevada, Golden Management Services has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Chris Dumayas, Michael Brown, Ryan Lui, and Michael Nijjar.  Scott Steven Brown has never been listed as an officer of the corporation.  (Id. ¶ 144.)

Since its incorporation in Nevada, Golden Management Services has listed its corporate officers in filings with the Nevada Secretary of State as Jesse Carrillo, Chris Dumayas, Michael Brown, Ryan Lui and Michael Nijjar.  Scott Steven Brown has never been listed as an officer of the corporation.  (Id. ¶ 145.)  Golden Management Services Inc. does business in California as Golden Management Services XLIX, Inc.  (Id. ¶ 146.)

Group XIII Properties, LP; Group XIII Properties, Inc.; DHA Opportunity 1, LP; DHA Opportunity 1, Inc.; Golden Opportunity No. 17 LP; Pama Management, Inc.; I E Rental Homes Inc.; Pro Management Company, and the seven other management entities incorporated in Nevada all share the same address: the "El Monte Office," 4900 Santa Anita Avenue, El Monte, CA 91731, the same address at which Mr. Nijjar opened his business in the 1970s.  (Id. ¶ 17; 44.)

### 5. Change in Management of the Villa La Paz Apartments

When Elisa Valerio entered into a written agreement to become residential manager of the Villa La Paz apartments in February 2019, the agreement indicated that her employer was Pama Management, although Defendants contend that her employer was I E Rental Homes.  (Id. ¶ 46.)  In February 2018, Ms. Valerio signed an acknowledgement that she had received a copy of the Pama Management Inc. Employee Handbook.  (Id. ¶ 47.)  On December 19, 2019, Ms. Valerio separated from I E Rental Homes because of "business closure" and executed an employment contract with Pro Management Company, Inc., virtually identical to the one she had executed earlier with Pama Management / I E Rental Homes.  (Id. ¶ 48.)  Ms. Valerio resigned from her position in March 2021.  Although Ms. Valerio's employer was Pro Management, the form documenting her resignation on March 13, 2021 contains a line at the bottom of the form for "PAMA USE."  (Id. ¶ 49.)  Sherri Wilson confirmed Ms. Valerio's resignation on April 1, 2021 as "Human Resources" for Pro Management.  (Id. ¶ 50.)

### 6. Ownership Structure of Villa La Paz Apartments

Since the formation of Group XIII Properties LP in 2014, its general partner has been Group XIII Properties, Inc.  (Id. ¶ 51.)  Swaranjit Nijjar is the sole shareholder of Group XIII Properties, Inc.  (Id. ¶ 52.)  Since the formation of Group XIII Properties LP in 2014, its limited

partner has been the Nijjar Family Trust, whose trustees are Swaranjit Nijjar and his wife, Patricia Nijjar.  (Id. ¶ 53.)  The share of profits and losses of Group XIII Properties LP is split 99 percent to the limited partner, the Nijjar Family Trust, and 1 percent to the general partner, Group XIII Properties, Inc.  (Id. ¶ 54.)  Since the formation of DHA Opportunity 1 LP in 2011, its general partner has been DHA Opportunity 1, Inc.  (Id. ¶ 55.)  Since at least May 3, 2019, Daljit Kler has been the sole shareholder of DHA Opportunity 1, Inc.  (Id. ¶ 56.)  Since the formation of DHA Opportunity 1 LP in 2011, its limited partner has been Daljit Kler.  (Id. ¶ 57.)  The share of profits and losses of DHA Opportunity 1 LP is split 99 percent to the limited partner, the Nijjar Family Trust, and 1 percent to the general partner.  (Id. ¶ 58.)

### 7.  Transfers of the Villa La Paz Apartments

In a grant deed signed January 2, 2019, Group XIII Properties, LP purported to transfer title of 675 South San Jacinto Street in Hemet, CA (the Villa La Paz Apartments) to DHA Opportunity 1, LP.  The grant deed was executed by Swaranjit Nijjar, President of Group XIII Properties, Inc., the general partner of Group XIII Properties, LP.  That grant deed was not recorded at that time.  (Id. ¶ 59.)  In a grant deed dated May 13, 2021, Group XIII Properties, LP purported to transfer title of the Villa La Paz Apartments to DHA Opportunity 1, LP.  The grant deed was executed by Swaranjit Nijjar, President of Group XIII Properties, Inc.., the general partner of Group XIII Properties, LP.  Although dated May 13, 2021, the deed was not notarized until July 13, 2021.  (Id. ¶ 60.)

That grant deed was recorded with the County of Riverside on July 29, 2021 and indicated that the Documentary Transfer Tax was $0 because "[t]he Grantors and the Grantees in this conveyance are comprised of the same parties who continue to hold the same proportionate interest in the property R & T 11932(d)."  (Id. ¶ 61.)  Plaintiffs filed this action on June 2, 2021.  (Id. ¶ 62.)  Plaintiffs served the summons and complaint on the office of the agent for service of process for Defendants Group XIII Properties, Inc. and Group XIII Properties, LP on June 7, 2021.  (Id. ¶ 63.)  The grant deed purporting to transfer the Villa La Paz Apartments from Group XIII Properties LP to DHA 1 Opportunity LP dated January 2, 2019 was recorded with the County of Riverside on July 30, 2021.  That deed contains handwriting that it is a "correction" "grant deed" with an asterisk indicating that it is "correcting transfer fee."  (Id. ¶ 64.)  The deed itself contains evidence that the original deed stated that $0 Documentary Transfer Tax was due because of an exemption, the nature of which is whited out.  (Id. ¶ 65.)

### 8.  Other Property Transfers

In a grant deed dated August 17, 2017, Group XIII Properties, LP transferred the real property 1250 North "F" Street in San Bernardino APN 0145-232-23 to DHA Opportunity 1, LP.  The grant deed recorded with the County of San Bernardino on August 18, 2016 indicated that the Documentary Transfer Tax was $0 because "[t]his conveyance confirms a change of name and the grantor and grantee are the same party R&T 11911."  (Id. ¶ 66.)  In a grant deed dated October 13, 2017, Group XIII Properties, LP transferred the real property 421 N. San Jacinto St., in Hemet, CA to DHA Opportunity 1, LP.  The grant deed recorded with the County

of Riverside on November 17, 2017 indicated that the Documentary Transfer Tax was $0 because "[t]his conveyance confirms a change of name and the grantor and grantee are the same party R&T 11911L." (Id. ¶ 67.)

In a grant deed dated July 10, 2015, Group XIII Properties, LP transferred the real property 24864 Eucalyptus Avenue in Moreno Valley to DHA Opportunity 1, LP.  The grant deed recorded with the County of Riverside on July 14, 2015 indicated that the Documentary Transfer Tax was $0 because "[t]his is a bona fide gift and the grantor received nothing in return[.]"  (Id. ¶ 68.)  On July 21, 2015, DHA Opportunity 1, LP executed a deed of trust on the property to secure a $900,000 loan.  Swaranjit Nijjar signed as President of DHA Opportunity 1, Inc., the general partner of DHA Opportunity 1, LP.  The deed of trust was recorded on July 31, 2015.  (Id. ¶ 69.)

In a grant deed dated April 15, 2019, Group XIII Properties, LP transferred the real property 380 E. Nicolet in Banning, CA to DHA Opportunity 1, LP.  The grant deed recorded with the County of Riverside on May 10, 2019 indicated that the Documentary Transfer Tax was $0 because "[t]his is a bona fide gift and the grantor received nothing in return[.]"  (Id. ¶ 70.)  On May 8, 2019, DHA Opportunity 1, LP executed a deed of trust on the property to secure a $1,560,000 loan.  Daljit Kler signed as President of DHA Opportunity 1, Inc., the general partner of DHA Opportunity 1, LP.  The deed of trust was recorded on May 10, 2019, along with the grant deed.  (Id. ¶ 71.)

In a grant deed dated August 21, 2019, Golden Opportunity No. 17 LP transferred 1927 Eagle Mountain Road in San Bernardino, CA to DHA Opportunity 1, LP.  The grant deed recorded with the County of San Bernardino on August 22, 2019 indicated that the Documentary Transfer Tax was $0 because "[t]his conveyance changes the manner in which title is held, grantor(s) and grantee(s) remain the same and continue the hold the same proportionate interest[.]"  The grant deed was signed on behalf of Golden Opportunity No. 17 LP by "Sanjeet S. Nijjar, Partner."  (Id. ¶ 72.)  On June 29, 2018, Golden Opportunity No. 17 LP filed an Amendment to the Certificate of Limited Partnership with the California Secretary of State.  The amendment was signed by "Sanjeet Nijjar, President of Starlite Mgmt – V Inc., General Partner."  (Id. ¶ 73.)

### 9. Management of the Villa La Paz Apartments

On January 1, 2020, DHA Opportunity 1, LP entered into a Property Management Agreement with Pro Management Company Inc., a Nevada corporation, to "rent, lease operate and manage the Villa La Paz apartments.  (Id. ¶ 74.)  Under the terms of the Property Management Agreement, DHA Opportunity 1, LP agreed to indemnify and hold harmless Pro Management company from all liabilities, including those arising out of its management of the Villa La Paz apartments.  (Id. ¶ 75.)  Under the terms of the Property Management Agreement, DHA Opportunity 1, LP was responsible for all of insurance, including general liability and worker's compensation insurance.  (Id. ¶ 76.)  The Management Liability Coverage Binder indicates that Pama Management Inc. is the insured and the "Parent Company" of Group XIII

Properties LP and DHA Opportunity 1, LP.  (Id. ¶ 77.)  Under the terms of the Property Management Agreement, DHA Opportunity 1, LP agreed that Pro Management Company may perform any of its duties through attorneys, agents, employees or independent contractors.  (Id. ¶ 78.)

### 10. Complaints Regarding Nijjar Family Properties

Swaranjit Nijjar has given his sister Daljit Kler "100 percent control" of the operation of the management, repair and maintenance of all buildings under Pama Management's control.  (Id. ¶ 80.)  Daljit Kler, Jesse Carrillo, Sherri Wilson and Everet Miller (while he still worked for Pama) were informed when a lawsuit was filed.  (Id. ¶ 81.)  Notices of administrative civil penalties on properties levied by local government would be directed to Daljit Kler and it was her responsibility to handle them.  (Id. ¶ 86.)

Between 2019 and 2022, the Fair Housing Council of Riverside County has received 366 complaints or requests for services from tenants or rental applications regarding properties managed by Pro Management Company, Pama Management and I E Rental Homes.  (Id. ¶¶ 147-48.)[3]  Of these calls, 17 concerned complaints of housing discrimination.  (Id. ¶ 148.)[4]  In 2017, the Fair Housing Council of Riverside County entered into a settlement agreement with I E Rental Homes, signed by Sherri Wilson, to resolve a fair housing complaint filed with the Department of Fair Employment and Housing.  In that agreement, I E Rental Homes did not admit liability but agreed to compensate an individual who alleged discrimination; in the agreement, I E Rental Homes acknowledged an "affirmative duty under the Fair Employment and Housing Act (FEHA) not to discriminate."  (Id. ¶ 152.)[5]

In 2013, Inland Fair Housing and Meditation Board filed a housing discrimination complaint with the United States Department of Housing and Urban Development (HUD) in Case 09-13-0229-8 alleging that Nijjar Realty, Inc., DBA Pama Management Company, and its employees violated the Fair Housing Act by, among other things, refusing to rent or offering less favorable rental terms to African Americans and firing resident managers who did not comply

---

[3] Moving Defendants dispute the "veracity" of the complaints.  Plaintiffs do not ask the Court to find that any or all of the complaints were true or legally meritorious; this fact is undisputed.

[4] Moving Defendants dispute "that any of the 17 calls over the course of four years were complaints at the subject property, related to any of the entity defendants, or true."  Plaintiffs do not suggest that the calls related to the exact property at issue; the Declaration of Sara Tellez establishes personal knowledge and adequate foundation for the contention that the complaints *do* relate to the entity Defendants, which are controlled by the Nijjar family.

[5] Moving Defendants claim that there "is no Exhibit B to the Declaration of Elizabeth Brancart" so the "statement should be stricken on that basis."  There is an Exhibit B to the Declaration of Elizabeth Brancart.  (See Dkt. No. 61-3.)  That exhibit is the Settlement Agreement referenced by Plaintiffs.

with that directive.  (Id. ¶ 82.)[6]  In 2016, a disabled man sued Pama Management Inc., Nijjar Realty, Inc. and Group XIII Properties, LP for violating the Fair Housing Act by willfully refusing to make a reasonable accommodation.  (Id. ¶ 83.)  In 2019, Pama Management Inc., I E Rental Homes Inc., Nijjar Realty Inc., among other Nijjar entities, settled a housing discrimination complaint in HUD Case 09-18-2663-8.  Under that agreement, the Nijjar entities agreed to comply with all provisions of the Fair Housing Act of 1968 and the Fair Housing Amendments Act of 1988.  Sherri Wilson signed the conciliation agreement on behalf of the entities.  (Id. ¶ 84.)

Group XIII Properties LP, I E Rental and Pama Management, Inc. have been sued on multiple occasions by tenants asserting habitability claims.  (Id. ¶ 87.)  In 2022, the City of San Bernardino and County of San Bernardino recorded liens for nuisance abatement and fire hazard abatement by Group XIII Properties LP and DHA Opportunity 1 LP.  (Id. ¶ 88.)

Joaquin Rodriguez was employed by Pro Management as a resident manager of the property located at 3533 Dwight Avenue in Riverside, CA from August 2020 until March 2023.  (Id. ¶ 91.)  During his time as resident manager, Mr. Rodriguez met Daljit Kler and Sherri Wilson at the Pro Management office and attended at least one resident managers' meeting with Ms. Kler.  (Id. ¶ 93.)  The property located at 3533 Dwight Avenue in Riverside was owned by Golden Opportunity No. 14 LP from May 17, 2019 until June 15, 2022, when it transferred title to MLMZG 14 LP.  (Id. ¶ 94.)  Both Golden Opportunity 14 LP and MLMZG 14 LP are limited partnerships controlled by Michael Nijjar.  (Id. ¶ 95.)

Although there is no evidence in the record as to whether Pro Management has a written fair housing policy because of the discovery dispute discussed below, it is undisputed that the other entities controlled by the Nijjar family to which Defendants responded to Plaintiffs' Requests for Production do not.  (Id. ¶ 85; DSSUF Reply ¶ 85; Declaration of Elizabeth Brancart ¶ 68. )

### 11.  Officer Designations

Although Daljit Kler is president and never has been as CEO or a Director of Pama Management, Inc., the July 16 and August 2017 Statements of Information filed by Pama Management Inc. with the California Secretary of State were signed by Swaranjit Nijjar as "president" and identified Ms. Kler as a Director, CEO and Secretary.  (Id. ¶ 96.)  The Statement of Information Pama Management Inc. submitted to the Secretary of State in April 2018 identified Ms. Kler as the CEO, Secretary, and Chief Financial Officer.  She was not Chief Financial Officer.  (Id. ¶ 97.)  The Statement of Information Pama Management, Inc. submitted to the Secretary of State in July 2018 was signed by Swaranjit Nijjar and identified him as the CEO, Secretary and Director.  He was none of these.  (Id. ¶ 98.)

---

[6] Moving Defendants dispute the truth of the allegations in this complaint and those that follows.  Plaintiffs do not ask the Court to find that the alleged facts are true; the existence of the complaints is undisputed.

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk mg

The Statement of Information Pama Management Inc. submitted to the Secretary of State in August 2018 was signed by Daljit Kler as President, identified her as the Secretary and Director, Everet Miller as CEO, and Ryan Liu as CFO. (Id. ¶ 99.) But Mr. Everet was the CFO, not Ryan Lui. Ms. Kler was not a director. (Id. ¶ 100.)

Ms. Kler executed the 2019 Corporate Statement of Information for Pama Management Inc., filed with the California Secretary of State on May 20, 2019, identifying herself as President, Secretary and Director. (Id. ¶ 101.) Michael Brown, as Pama's Chief Registered Agent, executed the 2022 corporate Statement of Information for Pama Management, Inc., filed with the California Secretary of State on May 2, 2022. That document struck Ms. Kler as secretary and listed Scott Brown as the sole officer and director; it also listed the corporate address as the El Monte Office. Pama's 2023 Corporate Statement of Information, filed February 25, 2023, repeats the same information. (Id. ¶ 102.)

I E Rental Homes, Inc., the dba of Pama Management, Inc., is another one of Defendants' corporations. (Id. ¶ 103.) The first Corporate Statement of Information filed with the California Secretary of State for I E Rental Homes, Inc. was filed on September 20, 2022. Like the 2022 Corporate Statement of Information filed for Pama, it strikes Ms. Kler as Secretary and lists the El Monte Office, but names Michael Brown, not Scott Brown, as the sole officer and director. I E Rental Homes' 2023 Corporate Statement of Information, filed February 21, 2023, repeats the same information. (Id. ¶ 104.)

Scott Steven Brown has been a real estate broker, licensed by the DRE, since January 27, 2005. (Id. ¶ 112.) Scott Steven Brown served as the licensed designated corporate officer of I E Rental Homes, Inc. between March 22, 2019 and March 8, 2022. Ms. Kler served as I E Rental Home, Inc.'s designated officer-broker between March 8 and August 1, 2022. Prior to March 22, 2019, Everet Miller was I E Rental Homes' designated officer-broker. (Id. ¶ 114.) Scott Steven Brown served as the licensed designated corporate officer of Pama Management, Inc. between March 22, 2019 and August 1, 2022. Ms. Kler served as Pama's licensed designed corporate officer during the same period. Mr. Nijjar served as Pama's broker associate between November 11, 2019 and October 28, 2021. (Id. ¶ 115.)

**D.  Additional Disputed Facts**

Plaintiffs, the nonmoving party, submit the following additional evidence, which the Court construes as disputed in whole or in part:

According to Mr. Beasley, on May 5, 2020, Ms. Valerio left the apartment before Mr. Beasley and joined her husband outside. As Mr. Beasley was walking out of the unit, he overheard Ms. Valerio tell her husband, "This is why I don't like renting to n*****s; they are always complaining." (PAMF ¶ 8.) Ms. Valerio denies using a racial slur. (DSSUF ¶ 3.)

During his employment with Pro Management, Mr. Rodriguez reported to a manager identified as "Arlene," who worked out of the Pro Management office. (PAMF ¶ 92.) She

---

instructed Mr. Rodriguez that he should discourage African American rental applicants and favor Latino or white applicants.  (Id.)[7]

## III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  Id. at 325.  Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case.  Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  Anderson, 477 U.S. at 250.

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial.  Celotex, 477 U.S. at 324.  The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252.  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991).  Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

//

---

[7] Moving Defendants object to these statements on hearsay and relevance grounds.  They are of marginal relevance, even though the Court does not find them material to the issues discussed below, since they are too attenuated from Moving Defendants.  It is certainly not helpful that Mr. Rodriguez does not even identify the last name of "Arlene," let alone her specific role.  Moving Defendants are correct that this fact does not demonstrate that "racial discrimination was instructed as a company policy"; the Court does not draw that conclusion.  (Defendants' Evidentiary Objections at 27.)  The statement is hearsay, but it is possible that Plaintiffs could present the evidence in admissible form at trial, either by calling the declarant as a witness and asking her to admit that she encouraged such discriminatory practices or, if denied, calling Mr. Rodriguez to impeach her denial.  While the Court OVERRULES the objections, it does not rely upon the fact in its discussion below.

## IV. DISCUSSION

Moving Defendants argue that there is no basis for Plaintiffs to hold them individually liable in this action, asserting that "[t]hey have been named in this lawsuit solely because they hold ownership interest and corporate positions in companies that currently own or previously owned the Villa La Paz apartments." (MSJ at 7.) Plaintiffs posit three theories of individual liability against Moving Defendants: (1) they operated a "single enterprise" or "joint venture"; (2) they are the alter ego of their corporate entities; and (3) they can be held directly or vicariously liable under federal (24 C.F.R. §100.7) and state (2 Cal. Code Regs. § 12010) regulations. (See Opposition.)

Before turning to the substance of the MSJ, the Court notes the potentially critical errors Plaintiffs' Counsel has made during the discovery phase of this action, which may or may not have affected the outcome reached here. As Plaintiffs relate in the Opposition, they initially sought to take the depositions of Mr. Nijjar, Ms. Kler and Ms. Valerio, noticing their depositions for specific dates on multiple occasions. (See Opposition at 7.) Defendants' Counsel advised that those dates were unavailable and asked to reschedule; according to Plaintiffs, their requests for alternative deposition dates went unanswered. (Id.) Without any legal authority for this request, Plaintiffs claim that, "[b]ased on their refusal to appear for deposition, the Court should disregard their declarations" when considering the MSJ; predictably, the declarations of these three individuals form its primary factual basis. (Id.) Defendants counter that they "have not refused to produce any of these witnesses for deposition." (Reply at 4.) Moreover, "at no point have Plaintiffs attempted to move to compel any of the foregoing discovery." (Id.) The Court's review of the underlying communications between counsel, and the docket, indicates that Defendants are correct: while they did seek to (re)schedule these depositions, at no point did they indicate any opposition to taking the three individuals' depositions or remotely suggest that the depositions would be improper or unnecessary. If Plaintiffs thought the depositions of these individuals were important to their case, they could have, and should have, moved to compel their depositions before the close of discovery. They did not. (See Motion to Compel; Discovery Order) (addressing other discovery issues). Indeed, given that Ms. Valerio is arguably the central actor in this case, the Court is mystified that Plaintiffs would not insist on deposing her. In addition to testifying as to what transpired regarding her interactions with Mr. Beasley, Plaintiff's Counsel would have had an opportunity to ask her about the extent of her relationship with Mr. Nijjar and Ms. Kler, the scope of their involvement in the day-to-day operations of the relevant corporate entities, her (and potentially their) awareness of a pattern or practice of discriminatory conduct, and so forth. Deposing Mr. Nijjar and Ms. Kler would seemingly have been even more relevant to opposing the MSJ. The Court is even more mystified why Plaintiffs would try to impose individual liability on them, already a herculean task under prevailing legal standards, without exercising their best opportunity to garner evidence in support of a contention that the corporate veil should be pierced: forcing them to testify under oath.

It is equally confusing why Plaintiffs would expend considerable resources obtaining numerous corporate records and yet fail to obtain the records of arguably the most relevant corporate entity: Pro Management, which indisputably employed Ms. Valerio, the sole actor

---

against whom Plaintiffs have any direct evidence of racial discrimination.  (See DSSUF Reply ¶ 85.)  Plaintiffs' Counsel have noted that Defendants' Counsel objected to the production of various records on behalf of Pro Management and failed or refused to produce responsive materials.  (See Christopher Brancart Declaration ¶¶ 14-15.)  Once again, Plaintiffs could have, and should have, moved to compel production of these records; they failed to.

It is possible, perhaps even likely, that Defendants dragged their feet on producing discovery, objected to evidence that should have been turned over, and were less than cooperative in finding deposition dates.  But if Plaintiffs needed more time to conduct discovery, all they would have needed to do is request that the Court extend the discovery cut-off deadline.  The Court almost certainly would have granted that request, but they failed to do that either.  The Court finds it extremely unlikely that Plaintiffs were caught off guard by the substance of the MSJ, for any competent lawyer would have seen it coming.  And ironically, Plaintiffs' Counsel represented the interracial couple in Meyer v. Holley, 537 U.S. 280 (2003) that created the central rule relevant here: that an officer or owner of a real estate entity generally cannot be held individually liable for an FHA violation.  See id. at 282.  If anyone should have seen the argument raised in the MSJ coming, it is them.  More importantly, Defendants have long made clear that they intended to make this argument.  (See Application for Partial Stay.)  But even assuming Plaintiffs did not fully anticipate the MSJ, and wanted or needed more time to conduct discovery to oppose it, the Federal Rules of Civil Procedure provide a remedy for that, too: Rule 56(d) allows a nonmovant to file an "affidavit or declaration" with specific reasons why it "cannot present facts essential to justify its opposition" and ask the court to defer ruling on the motion for summary judgment or allow further time for discovery.  See Fed. R. Civ. P. 56(d).  Had Plaintiffs filed a Rule 56(d) request, seeking more time to conduct limited relevant discovery (i.e., to depose Moving Defendants and/or Ms. Valerio, obtain records from Pro Management, etc.), the Court almost certainly would have granted it.  But Plaintiffs have not done that either.

The Court does not take the decision to grant the MSJ lightly.  While the legal authorities below reveal why it is always an uphill battle to hold an individual owner or shareholder liable, there are rare situations in which that may be appropriate.  See Meyer, 537 U.S. at 282, 292 (holding that the FHA "*normally* imposes vicarious liability upon the corporation but not upon its officers or owners" and that a plaintiff may "pierce the corporate veil" in an "appropriate case") (emphasis added).  It is possible that this would have been one of them, had Plaintiffs' Counsel zealously pursued the necessary discovery, i.e., deposing the key individuals and obtaining records from all the relevant corporate entities.  Their failure to do so produced the record before the Court.  And on that record, the Court has no choice but to GRANT the MSJ.

## A.  Background Principles of Vicarious Liability

The Court begins its analysis with fundamental principles of vicarious liability, which courts have determined based on traditional common law rules.  McDonald v. Coldwell Banker, 543 F.3d 498, 506 (9th Cir. 2008) (citing Meyer, 537 U.S. at 285).  When applying and construing federal statutory law, courts apply the "general common law of agency, rather than [] the law of any particular State[.]"  Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989).

The FHA is no exception: the Supreme Court held in <u>Meyer</u> that "traditional agency principles" apply to the Act, "*i.e.*, it normally imposes vicarious liability upon the corporation but not upon its officers or owners." 537 U.S. at 282. In <u>Meyer</u>, the Supreme Court found that it was "well established that the Act provides for vicarious liability." <u>Id.</u> at 285. Under traditional vicarious liability rules, "principals or employers [are] vicariously liable for their agents or employees in the scope of their authority or employment." <u>Id.</u> "And in the absence of special circumstances it is the *corporation, not its owner or officer*, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." <u>Id.</u> at 286 (emphasis added). In the opinion below, the Ninth Circuit "imposed more extensive vicarious liability" in construing the Act, holding that it "made corporate owners and officers liable for the unlawful acts of a corporate employee simply on the basis that the owner or officer controlled (or had the right to control) the actions of that employee." <u>Id.</u> at 286. The Supreme Court reversed, finding that, "[i]n the absence of legal support, [it] cannot conclude that Congress intended, through silence, to impose this kind of special duty of protection upon individual officers or owners of corporations-who are not principals (or contracting parties) in respect to the corporation's unlawfully acting employee." <u>Id.</u> at 290. It declined to reach the question of whether a "corporation's liability may be imputed to the corporation's owner in an appropriate case" through "piercing of the corporate veil," leaving that question for the Ninth Circuit to decide on remand. <u>Id.</u> at 292.

California courts have established the same general principles. "Corporate officers and directors cannot ordinarily be held personally liable for the acts or obligations of their corporation. However, they may become liable if they directly authorize or actively participate in wrongful or tortious conduct." <u>Taylor-Rush v. Multitech Corp.</u>, 217 Cal. App. 3d 103, 113 (Ct. App. 1990), <u>reh'g denied and opinion modified</u> (Feb. 8, 1990); <u>accord Wyatt v. Union Mortg. Co.</u>, 24 Cal. 3d 773, 785 (1979).

It follows that, under the FHA, and in the absence of any "special circumstances" discussed below, Moving Defendants cannot be held vicariously liable for the conduct of an employee like Ms. Valerio, "as it is the business entity that is the principal or employer." <u>Sanzaro v. Ardiente Homeowners Ass'n, LLC</u>, 364 F. Supp. 3d 1158, 1176 (D. Nev. 2019) (citing <u>Meyer</u>, 537 U.S. at 286). The same is true under the California law under which Plaintiffs bring suit, the FEHA. "Because FEHA is based on the Fair Housing Act, liability under the Fair Housing Act also supports liability under FEHA." <u>Iniestra v. Cliff Warren Invs., Inc.</u>, 886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012) (citing <u>Brown v. Smith</u>, 55 Cal. App. 4th 767, 780 (1997)). Like the FHA, the FEHA does not impose vicarious liability on individual corporate officers or directors, or supervisors, who do not authorize or personally participate in the tortious conduct. <u>See Fiol v. Doellstedt</u>, 50 Cal. App. 4th 1318, 1327-31 (1996); <u>Parks v. Bd. of Trustees of Cal. State Univ.</u>, 2010 WL 1611136, at *3 (E.D. Cal. Apr. 20, 2010) (explaining that a "simple vicarious liability theory" against an individual is not "cognizable under FEHA").

Traditional vicarious liability principles also apply to Plaintiffs' remaining causes of action. A plaintiff must establish the same elements of an FHA claim to succeed on a cause of action brought under 42 U.S.C. § 1982, provided the latter is based on the same allegations as the

former, which appears to be the case here.  See Selden Apartments v. U.S. Dep't of Hous. & Urb. Dev., 785 F.2d 152, 159 (6th Cir. 1986).  Section 1982, like Section 1983, should be interpreted in light of the "background of tort liability."  See City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709 (1999).  Finally, negligence, like the other tort claims brought here, is subject to the same vicarious liability principles: "Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done." United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal. 3d 586, 595 (1970).  As such, absent some exception identified below, Plaintiffs cannot hold Moving Defendants liable as individuals for acts of employees like Ms. Valerio under any of their causes of action.

Plaintiffs do not question these principles, nor do they dispute most of Moving Defendants' evidence.  Plaintiffs do not argue that Moving Defendants personally participated in or authorized Ms. Valerio's tortious conduct, or even that they were aware of it.  It is undisputed that Ms. Valerio never communicated with, or received direction from, Moving Defendants related to Mr. Beasley's application.  (DSSUF ¶ 6.)  It is undisputed that neither Mr. Nijjar nor Ms. Kler were aware of Mr. Beasley's application for a rental unit at the time it was filed or reviewed.  (Id. ¶ 7.)  It is undisputed that corporate entities, not Mr. Nijjar and Ms. Kler in their personal capacities, owned and managed the Villa La Paz Apartments.  (See id. ¶¶ 11-15, 19-20.) While these corporate entities may be liable for Ms. Valerio's conduct, Mr. Nijjar and Ms. Kler cannot be held liable for it simply because they are owners or officers of the corporate entities. See Meyer, 573 U.S. at 282.

With these principles in mind, the Court turns to the three arguments raised by Plaintiffs. None of them are persuasive, and all of them have the same problem in common: they are primarily directed toward the wrong legal framework.  The sizeable body of evidence cited above, and the arguments assessed below, may very well raise a genuine issue of material fact, and probably more than that, as to whether there is a basis to impute liability for one entity Defendant onto another.  Put another way, Plaintiffs have marshaled an impressive body of evidence regarding the irregular, and possibly illegal, way in which the Nijjar family owns and operates its various corporate entities.  These entities may or may not be treated interchangeably by the family, act as mere shells or conduits for one another, and so forth.  Doubtless, virtually all of the profits from the corporations appear to flow directly to the Nijjar Family Trust.  Applying one of the theories assessed below, it may very well be true that one corporate entity is the mere "alter ego" of the other.  But there is a critical distinction between holding one *corporate entity* liable for the acts of another (extensively related) *corporate entity* and holding an *individual* liable for the acts of an employee that works for a *corporation*.  Most of Plaintiffs' arguments and cited authorities miss the mark, for they concern the former, and not the latter.

## B.  Single Enterprise or Joint Venture Liability

Plaintiffs first argue that Moving Defendants are individually liable under a "single enterprise" or "joint venture" theory of liability.  The argument goes as follows:

> Nijjar and Kler operate their rental property business as a single integrated enterprise or joint venture. They exercise direct and ultimate control over that enterprise, creating and discarding corporate entities as mere instrumentalities in that operation. Under these circumstances, it is appropriate to disregard their nominal corporate entities and hold each personally liable.

(Opposition at 10.) This claim is rather breathtaking in scope, for it would seem to circumvent the entirety of the common law of agency, discussed above, and fundamental principles of corporate law. Many wealthy individuals own, in whole or in part, a series of corporate entities, such as LLCs. Some of them "grew [a] family enterprise into a rental property empire," as Plaintiffs claim Mr. Nijjar and Ms. Kler have done. (Opposition at 6.) Under Plaintiffs' theory, it would appear that courts would be free to disregard the distinct character of these corporate entities and treat the individual family members as liable in their individual capacities for any wrongdoing at their companies. In essence, at least for individuals who have "create[ed] and manipulat[ed] . . . dozens of closely held corporate entities that enable them to pose as mere corporate officers or absentee property owners" (Opposition at 6), family enterprises lose the protections of limited liability. Plaintiffs' cited authorities do not support this radical theory.

Plaintiffs begin by stating that "[a] joint enterprise is 'an association of two or more persons who combine their property, money, efforts, skill or knowledge to carry out a single business enterprise with the objective of realizing a profit.'" (Opposition at 10) (quoting <u>Shell Oil Co. v. Prestidge</u>, 249 F.2d 413, 415 (9th Cir. 1957)). This first principle is not objectionable. What Plaintiffs fail to explain or even acknowledge is that this case cited those principles when "[c]onsidering the relationship existing between Shell and Rocky Mountain," and that it was the "plaintiff's theory that Shell Oil Company and Rocky Mountain Oil Corporation were joint venturers engaged in the search for oil in the area concerned, or that Rocky Mountain was the agent of Shell in drilling the well where the injury occurred." <u>Id.</u> at 414-15. Shell argued that "Rocky Mountain was an independent contractor, for whose negligence Shell was not responsible[.]" <u>Id.</u> at 414. The issue was thus whether an agreement signed between the two *corporate entities* and the other evidence were sufficient to establish that "the relationship between Shell and Rocky Mountain was that of joint adventures," such that "Rocky Mountain's negligence would be imputed to Shell." <u>Id.</u> at 415. The Ninth Circuit answered in the affirmative. <u>See id.</u> at 416. In other words, that entire case was about whether one *corporation* was liable for the acts of another *corporation*. It said nothing about whether individuals could be held liable and certainly did not establish Plaintiffs' nebulous theory of joint venture liability. To the extent that the case referred to "persons," it has been beyond doubt for well over a century that corporations have personhood and qualify as such. <u>See Pembina Consol. Silver Mining & Milling Co. v. Com. of Pennsylvania</u>, 125 U.S. 181, 189 (1888) ("Under the designation of 'person' there is no doubt that a private corporation is included."); <u>Nw. Nat. Life Ins. Co. v. Riggs</u>, 203 U.S. 243, 255 (1906).

Plaintiffs' next authority, <u>Trans-Tec Asia v. M/V HARMONY CONTAINER</u>, 435 F. Supp. 2d 1015 (C.D. Cal. 2005), <u>aff'd</u>, 518 F.3d 1120 (9th Cir. 2008), explained that there are

---

four elements under federal common law "essential to a joint venture: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." Id. at 1032 n. 23 (citing Restatement (Second) of Torts § 491 cmt. c (1965)). Once again, that case discussed whether liability could be imputed from one corporation, Powick, to another corporation, Kien Hung. See id. at 1032. And even then, the court explained why the joint venture theory did not apply:

> To prevail on its joint venture theory, Trans–Tec must do more than simply prove the existence of a joint venture. Since "[a] corporation and a joint venture are mutually exclusive ways of doing business," . . . Trans–Tec must persuade the Court to disregard Splendid's corporate form. Further, in order to establish that Powick was a shell corporation for Kien Hung, Trans–Tec must establish that Powick had no separate corporate existence from Kien Hung.

Id. at 1032 (internal citations omitted). Trans-Tec is thus inapposite.

The Court agrees that "California law is similar," a proposition for which Plaintiffs cite Connor v. Great W. Sav. & Loan Ass'n, 69 Cal. 2d 850 (1968). (Opposition at 10.) That case states, as Plaintiffs correctly quote, "[a] joint venture exists when there is 'an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, and understanding as to the sharing of profits and losses, and a right of joint control.'" Connor, 69 Cal. 2d at 863. The next sentence reveals why, like the authorities cited above, it is of no use to Plaintiffs: it concerned whether a joint venture existed between "Great Western and Conejo," two corporations. See id. at 856-57 (explaining operations of the Conejo Valley Development Company, "which bought and sold the homes" negligently, and Great Western Savings and Loan Association, which participated in the tract development).

Plaintiffs next explain that "the elements of a common enterprise are similar to that of a joint venture." (Opposition at 11.) Their discussion of this theory involves two cases where individuals were held liable under the Federal Trade Commission Act (FTC Act). Under Ninth Circuit FTC Act precedent, "entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142–43 (9th Cir. 2010). As that panel explained,

> In this case, the FTC presented evidence of both. The undisputed evidence is that Castro's *companies* pooled resources, staff, and funds; they were all owned and managed by Castro and his wife; and they all participated to some extent in a common venture to sell internet kiosks. Thus, all of the *companies* were beneficiaries of

> and participants in a shared business scheme, and the common
> revenue generated in the course of that scheme was the proper
> subject of the court's equitable powers under the FTC Act.

Id. at 1143 (emphasis added). Thus, the panel found liability on a common enterprise theory against the *corporate entities*, and upheld it in the context of the imposition of a constructive trust, an issue wholly irrelevant to this case. See id. The part of the opinion Plaintiffs do not cite is that captioned "Individual Liability Under the FTC Act," which goes on to say exactly what one might think: the panel found individual liability *under the FTC Act*, 15 U.S.C. § 45(a), a statute not at issue here. Id. at 1138. Under that statute, "[i]n order to establish individual liability to make equitable restitution under the FTC Act, the FTC must prove that an individual "'had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted.'" Id. at 1138 (citation omitted). The panel upheld the district court's determination that the individuals responsible had personal knowledge of the illegal conduct. See id. at 1138-41. In other words, the reason any individual was on the hook for corporate wrongdoing in F.T.C. v. Networks Servs. Depot was because of a particular form of liability imposed by the FTC Act. Congress could have imposed individual liability under parallel circumstances when it enacted the FHA, but at least as construed by the Supreme Court, it did not. Meyer, 573 U.S. 282. The same is true of Fed. Trade Comm'n v. Cardiff, 2020 WL 6540509 (C.D. Cal. Oct. 9, 2020), also cited by Plaintiffs. After discussing common enterprise in the context of the FTC Act, that case stated,

> [I]ndividuals are liable for corporate violations of the FTC Act if
> they (1) "participated directly in the deceptive acts or had the
> authority to control them and (2) [ ] had knowledge of the
> misrepresentations, [were] recklessly indifferent to the truth or
> falsity of the misrepresentation, or [were] aware of a high
> probability of fraud along with an intentional avoidance of the
> truth." . . . The Cardiffs do not seriously dispute that they
> controlled the Entity Defendants and it is uncontroverted that they
> had knowledge of the misrepresentations in advertising or were
> recklessly indifferent to the falsity of the misrepresentations.

Id. at *13 (internal citations omitted). As in F.T.C. v. Networks Servs. Depot, the court found individual liability under the particular standards of the FTC Act, not Plaintiffs' sprawling theory of individual liability for the owners or officers involved in multiple businesses that interact with one another. See id.

In short, Plaintiffs are correct about the general principles of joint venture or common enterprise liability and wrong about their application to this case. The authorities they cite reveal why certain corporate entities may be liable for the tortious conduct of other corporate entities. They say nothing about the instant situation, in which Plaintiffs seek to impose individual liability on the basis of acts imputed to corporations. Plaintiffs' theory has no basis in precedent or

reason and is wholly incompatible with basic principles of corporate and agency law. The Court rejects it. The Court need not analyze the facts cited above in conjunction with this theory, for none of them in isolation or taken together are relevant—because any purported joint venture was undertaken by two corporate entities, there is no basis for imposing liability on two individuals, Mr. Nijjar and Ms. Kler.

## C. Alter Ego Liability

Plaintiffs argue in the alternative that Moving Defendants could be held liable under an alter ego theory. (Opposition at 26.) The standards for alter ego liability are similar under federal and California common law.

Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A., 992 F.3d 893 (9th Cir. 2021), a case cited by Plaintiffs, provides a useful summation of how the alter ego theory operates under federal common law and the factors courts consider when deciding whether it applies. As set forth therein, "[t]o pierce the corporate veil, a party must show that (1) 'the controlling corporate entity exercise[s] total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own," . . . (2) 'injustice will result from recognizing [the subservient entity] as a separate entity,' . . . and (3) the controlling entity 'had a fraudulent intent or an intent to circumvent statutory or contractual obligations'[.]" Id. at 898 (internal citations omitted). Courts consider a "nonexhaustive" list of factors, including:

> 1) disregarding corporate formalities such as, for example, in issuing stock, electing directors, or keeping corporate records; (2) capitalization that is inadequate to ensure that the business can meet its obligations; (3) putting funds into or taking them out of the corporation for personal, not corporate, purposes; (4) overlap in ownership, directors, officers, and personnel; (5) shared office space, address, or contact information; (6) lack of discretion by the allegedly subservient entity; (7) dealings not at arms-length between the related entities; (8) the holding out by one entity that it is responsible for the debts of another entity; and (9) the use of one entity's property by another entity as its own.

Id. (citations omitted). "But the mere presence of some of these indicia is not dispositive, nor is it necessarily enough to survive summary judgment." Id. For example, "a single person's common ownership of three corporations [is] insufficient to prove at trial that . . . corporations were alter-egos." Id. (citing Chan v. Soc'y Expeditions, Inc., 123 F.3d 1287, 1294 (9th Cir. 1997)). In Pac. Gulf Shipping, the Ninth Circuit cited approvingly a decision where "indirect ownership of all of a corporation's stock, a 'number of common officers and directors,' and 'substantial control' over an alleged subservient corporation's 'general policy decisions' were insufficient to 'establish a prima facie showing of alter ego' because the entities also observed corporate formalities and there was 'no more [control] than appropriate for a wholly-owned

---

subsidiary.'" Id. (quoting Adm'rs of Tulane Educ. Fund v. Ipsen, S.A., 450 F. App'x 326, 330–31 (5th Cir. 2011)). "Courts have also found that 'superficial indicia of interrelatedness' such as shared office space and phone numbers are 'not dispositive of the [alter-ego] question,' instead looking to a corporation's 'practical operation' as 'more instructive.'" Id. at 898 (citation omitted).

Plaintiffs fail to acknowledge the same problem that undermines their joint enterprise theory: the Ninth Circuit authority they cite, Pac. Gulf Shipping Co., and the cases cited in turn by that decision, all address whether the corporate veil can be pierced to reach *another* corporation. See id. at 898-90. Pac. Gulf Shipping Co. concerned whether Pacific Gulf, a corporate entity that chartered a vessel, could collect damages against two other corporate entities, Blue Wall and Vigorous Shipping, "on the grounds that they are either successors to or alter-egos of Adamastos [Shipping]," another corporate entity. See id. at 895. The Ninth Circuit rejected the alter ego theory, even though "it is undisputed that the operations of Blue Wall, Vigorous, and Adamastos all involve the Gourdomichalis brothers. Nor is it disputed that Adamastos, Phoenix, and Vigorous all shared the same office or that Blue Wall and Phoenix had the same contact information," because "these facts, absent any evidence suggesting wrongdoing, do not reasonably justify a finding of alter-ego." Id. at 900. For instance, there was no evidence of "financial mismanagement" among the relevant corporate entities, "no intermingling of funds and no raiding of bank accounts," and just a few "potential irregularities" from bank statements. See id. As such, there was "insufficient evidence to support a finding that the Gourdomichalis brothers operated either Blue Wall or Vigorous as an alter-ego of Adamastos, even after drawing all reasonable inferences in favor of Pacific Gulf." Id. at 900-01. As noted below, that factual showing to some degree parallels that made by Plaintiffs. But in a more fundamental aspect, the analysis is inapposite: nobody sought to impose *individual liability* on the "Gourdomichalis brothers" themselves, but rather the corporate entities they arguably controlled. The same is generally true of other federal authorities from, and within, the Ninth Circuit. For instance, Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586 (9th Cir.), supplemented, 95 F.3d 1156 (9th Cir. 1996) considered whether a subsidiary was acting as the alter ego of a parent company "'so as to justify disregard of the corporate entity," which can be made on the familiar showing that "(1) that there is such unity of interest and ownership that the separate personalities of [Keystone and GBL] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" Id. at 591 (citations omitted).

Nonetheless, other federal cases do acknowledge that "[a] corporation's veil may be pierced and the corporation may be deemed an alter ego of an *individual*[.]" Shanghai Automation Instrument Co. v. Kuei, 194 F. Supp. 2d 995, 1001 (N.D. Cal. 2001) (emphasis added). In Shanghai Automation, the court considered a host of factors in determining that four corporate entities, Microlink Data, Micro Link Systems, Cipher (CA) and MIG, Inc., and two individuals, Dennis Kuei and Matthew Tsai, possessed a unity of interest and ownership sufficient to state a claim for application of the alter ego doctrine. See id. at 1002. As alleged in the complaint, Kuei, the CEO of Microlink Data and Cipher, and Tsai, the president of Micro Link Systems and MIG, Inc. and a director of Microlink Data and Cipher, controlled all the corporate entities between the two of them. Id. at 1002. The individuals referred to and used the

corporate entities interchangeably, while the corporate entities shared "slightly different" names but the same business addresses. Id. More importantly, the two men "commingled the funds" of two corporate entities, while payments due from a joint venture to one corporation were made to a different corporation instead. Id. Probably most important of all, the two men "held themselves out to be personally liable for the debts" of a corporation by making a "personal payment" for one corporation's debt, and later personally borrowing money from the plaintiff by representing that the money was necessary on behalf of their corporate entities. Id. Finally, the corporate entities were suspended by the Franchise Tax Board. Id. Though the court did not have "information about corporate documents, financial records or other indicia of alter ego liability" at the pleading stage, the facts outlined above were sufficient to find that the corporate "suspended entities [] were mere shells for defendants Kuei and Tsai in an attempt to avoid personal liability," which established the first prong of alter ego liability. Id. at 1003. As to an inequitable result flowing from failure to disregard the separate entities, the court found that an "inequitable result exists where an unsatisfied creditor exists in connection with an abuse of the corporate form." Id. (citing United States v. Standard Beauty Supply Stores, Inc., 561 F.2d 774, 777 (9th Cir. 1977)). Were the corporate entities "not considered as the alter egos of defendant Kuei, an inequitable result would occur as defendant Kuei would be allowed to shield himself from liability from the conversion and transfer of funds into these currently-suspended corporate entities, which are apparently without assets[.]" Id. at 1003.

The Ninth Circuit's analysis on remand from Meyer, 537 U.S. 280 in Holley v. Crank, 400 F.3d 667 (9th Cir. 2005) provides further guidance on the alter ego question. The panel first considered a designated officer/broker theory of vicarious liability, under which "California law makes the designated real estate broker of a real estate corporation responsible for the supervision of the corporation's salespersons." Id. at 671. Plaintiffs raise no such theory here, so the Court does not consider it. (See Opposition.) As to alter ego liability, the Ninth Circuit first observed, "[w]hen substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on the grounds of equity and fairness, courts have been willing to apply the 'alter ego' or instrumentality theory in order to cast aside the corporate shield and to fasten liability on the individual shareholder." Id. at 674-75 (quoting 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corps., § 41.35 at 666–668 (perm. ed., rev. vol. 2004)). The panel then found the following allegations in the complaint sufficient to remand to the district court to allow further amendment of the complaint on an alter ego theory: the individual defendant, Meyer, was "Triad's sole shareholder at the time of the alleged violation under FHA," he was Triad's president and designated officer/broker, he failed to treat the corporation as a distinct entity in his tax return (paying Triad's taxes under his own tax identification number, not the corporation's), the "corporation was very thinly capitalized," and in one transfer "no corporate formalities were followed," which evidenced Meyer's view that the corporation was not a "distinct entity from himself." See id. at 675. And with regard to the "equity and fairness of the corporate shield to liability, the evidence before the district court revealed that Triad did not have assets to pay a judgment and that Triad's insurance policy excluded liability for discrimination in the provision of service." Id.

One other federal case is instructive.  In <u>Standard Beauty Supply Stores</u>, Inc., 561 F.2d 774, the Ninth Circuit considered the appeal of an individual, Hal Linden, from the district court's finding that he was personally liable for a default judgement against Standard Beauty Supply Stores, Inc.; the district court had found him, as the president and sole shareholder of that corporate entity, the alter ego of Linden.  <u>Id.</u> at 774-75.  The Ninth Circuit reversed and remanded, holding that the district court had incorrectly interpreted California law, mistakenly assuming that Standard Beauty's "failure to pay its California franchise taxes constituted prima facie evidence that Standard Beauty's corporate veil should be pierced," impermissibly shifting the burden onto the defendant, Linden, to prove that Standard Beauty "was not his alter ego," when the burden of proof "should have been on the United States," the plaintiff.  <u>Id.</u> at 775.  The Ninth Circuit stated that "[b]efore a court can hold that a corporation is the mere alter ego of its shareholders," a court must make a finding on both of the two prongs cited above.  <u>Id.</u> at 777.  The panel reasoned that the district court had failed to properly consider the "fraud and injustice" prong, because a failure to pay taxes did not necessarily establish that a corporate transaction (the acquisition of asset of O'Henri's Inc., a beauty and health supplier), was done in "bad faith."  <u>Id.</u> at 778.  Moreover, the other common factors were not present: "[t]here was apparently no commingling of personal and corporate funds," the Board of Directors of the corporation "met regularly and prior to major corporate actions," "books and records were carefully kept" and an "office was maintained," and so forth.  <u>Id.</u>

The relevant California authorities are much the same.  California courts generally apply the same two-prong test to pierce the corporate veil: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow."  <u>Mesler v. Bradd Mgmt. Co.</u>, 39 Cal. 3d 290, 300 (1985).  "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  <u>Id.</u>  The purpose of the doctrine is to bypass the corporate entity for the sole purpose of avoiding injustice.  <u>Id.</u>  Its "essence. . . is that justice be done[,] . . . [and t]hus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require."  <u>Id.</u> at 301.  "The terminology 'alter ego' or 'piercing the corporate veil' refers to situations where there has been an abuse of corporate privilege, because of which the equitable owner of a corporation will be held liable for the actions of the corporation."  <u>Roman Catholic Archbishop of San Francisco v. Superior Court</u>, 15 Cal. App. 3d 405, 411 (1971) (citing <u>Minton v. Cavaney</u>, 56 Cal. 2d 576, 579 (1961)).  In other words, alter ego liability "applie[s] when one corporation uses another to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose."  <u>Gopal v. Kaiser Found. Health Plan, Inc.</u>, 248 Cal. App. 4th 425, 431 (2016).  The party seeking to impose alter ego liability, here Plaintiffs, bear the burden of proof on this issue.  <u>See</u> <u>Minifie v. Rowley</u>, 187 Cal. 481, 488 (1921).

"Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other."  <u>Roman Catholic</u>

Archbishop, 15 Cal. App. 3d at 406; Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 838–839 (1963).  Other factors include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.  See Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1285 (1994); Associated Vendors, Inc., 210 Cal. App. 2d at 838-39; Sonora Diamond Corp. v. Superior Ct., 83 Cal. App. 4th 523, 538-39 (2000).  No one characteristic governs, but courts look at all relevant circumstances to determine whether the doctrine should be applied.  Talbot v. Fresno–Pacific Corp., 181 Cal. App. 2d 425, 432 (1969).  "Alter ego is an extreme remedy, sparingly used." Sonora, 83 Cal. App. 4th at 836.  As to the second prong, an inequitable result, "[t]he alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form.  Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard."  Sonora, 83 Cal. App. 4th at 539.

Most of the California cases do not concern the instant issue, whether individuals can be held liable, for alter ego liability is generally "reserved for the parent-subsidiary relationship." Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235 Cal. App. 3d 1220, 1249 (1991).  From the Court's review of the case law, the situations in which California courts have held individuals liable under the alter ego liability tend to fall within a narrow paradigm: when an individual forms a corporate entity, such as an LLC, that is essentially just a corporate shell for his or her personal affairs, especially one that represents an abuse of the corporate form because it is deliberately undercapitalized such that its creditors or the victims of the individual's tortious conduct would be denied relief unless they can hold the individually personally liable.  For example, in Say & Say, Inc. v. Ebershoff, 20 Cal. App. 4th 1759, 1760 (1993), the court considered whether the corporate entity of Say & Say, Inc. was subject to California's vexatious litigant law when it was formed by Liang-Houh Shieh, an individual who had previously been declared a vexatious litigant.  Id. at 1760-61.  The Court of Appeal assessed whether Say & Say could be upheld as the alter ego of Mr. Shieh.  Id. at 1766.  Virtually all of the relevant factors indicated it could: Say & Say was incorporated by Mr. Shieh's wife; Mr. Shieh told a paralegal he would "control the corporation" to "create a barrier"; he used his wife's name "to mask his participation" and "because he did not want to appear as the owner of the corporation,"; he formed it after being fired by his law firm "in order to keep up the pretense of not being able to practice law"; the corporation allegedly had offices at a given address but it was not listed on the building directory; instead, the corporation operated in Mr. Shieh's personal offices; the corporation never received any mail or telephone calls; there was no company letterhead; none of the employees of the corporation or Mr. Shieh had ever heard of the purported president of the entity; Mr. Shieh singlehandedly controlled every aspect of the corporation's affairs; and the corporation was not listed with the Secretary of State.  Id. at 1765-66.  When employees alleged they were not paid, Mr. Shieh claimed they were employees of Say & Say; meanwhile, there was evidence that "Mr. Shieh cannot pay his debts," owing over $300,000 in sanctions.  Id. at 1767.  Predictably, the Court of Appeal found that Say & Say was Mr. Shieh's alter ego and decided alter ego liability was necessary to prevent injustice, because the LLC was created for the express purpose of evading the law: "to protect Mr. Shieh from the consequences of litigation" and to "continue his persistent misuse of the litigation system."  Id. at 709, 711.

The Court turns to the evidence presented by Plaintiffs. Of the factors most commonly cited by federal and California courts, Plaintiffs have arguably produced some evidence of three: (1) identical equitable ownership, (2) use of the same offices and employees, and (3) disregard of corporate formalities. See Sonora, 83 Cal. App. 4th at 538-39. Though the undisputed facts do not demonstrate "identical directors and officers," they do at least demonstrate substantial overlap, which perhaps partially counts toward a fourth. See id. And there is possibly an inference of use of one corporate entity "as a mere shell or conduct for the affairs" of another, which might count as a fifth. See id.

It is undisputed that the various corporate entities referenced above, all controlled by the Nijjar family, list the El Monte Office as their place of business. (PAMF ¶¶ 17; 44; 102; 104; 119.) Plaintiffs have also submitted substantial evidence that the relevant corporate entities controlled by the Nijjar family, including the management companies that manage their properties, operate such that the Nijjar Family Trust is the limited partnership, taking upwards of 97 percent of the profits of the ventures. (See PAMF ¶¶ 25-33.) In a Nijjar family venture, the shareholders of the corporation serving as the general partner are members of the Nijjar family. (Id. ¶ 29.) This same pattern is true of DHA Opportunity 1, LP, owner of the La Villa Paz apartments, where the Nijjar Family Trust is the limited partner, enjoying 99 percent of the profits and losses of the entity. (See id. ¶¶ 51-58.) The Nijjar family appears to rely upon a small coterie of senior employees to run its various operations, all of whom are listed in public filings as officers of these entities in various and occasionally evolving capacities: Jesse Carrillo (Ms. Kler's chief of staff), Chris Dumayas, Ryan Lui, Michael Brown, and Scott Steven Brown. (See id. ¶¶ 41-42; 116-146.) Moreover, Plaintiffs have submitted substantial evidence that the Nijjar family has a pattern of misidentifying the title or nature of officer and director positions; for instance, Ms. Kler has been identified as holding a position of an entity that she does not formally have. (See id. ¶¶ 96-115.)

Some of the strongest evidence submitted by Plaintiffs is that which concerns the "emergency restructuring" of the Nijjar family enterprise in 2019 after the California DRE revoked the real estate licenses of Nijjar Realty, Inc. and Everet Miller, who was the designated officer/broker of Pama Management Inc. dba I E Rental Homes and Nijjar Realty, Inc. (Opposition at 14; PAMF ¶ 14.) As Plaintiffs explain, that revocation created an "existential crisis" for the family business because the California Real Estate Law imposes licensure requirements. (Opposition at 14) (citing Cal. Bus. Prof. Code §§ 10130; 10131(b). The extensive factual record above does raise the inference that Moving Defendants continued to operate the real estate business just as they had before 2019, albeit under different corporate names and structures. But there appears to be a significant problem with the restructuring: while both Mr. Nijjar and Ms. Kler are licensed real estate brokers, they are not listed as the designated officers of the Nevada management companies established within weeks of the California DRE revoking the real estate licenses of Nijjar Realty and Mr. Miller. Because each of these corporations, including Pro Management, listed Scott Steven Brown as their designated officer/broker, and he has never been listed as an officer of any of them, these entities may be out of compliance with California's licensing laws. (See Opposition at 21; PAMF ¶¶ 112-146.)

Among the relevant facts for present purposes, while Ms. Valerio was originally employed by Pama Management, on December 19, 2019, Ms. Valerio separated from I E Rental Homes (what Plaintiffs allege is a fictitious dba of Pama Management) because of "business closure" and executed a virtually identical employment agreement with Pro Management Company, Inc. (PAMF ¶ 49.)  There is a reasonable inference from the undisputed evidence that the operation of Pro Management was largely the same as that carried out under the name of Pama Management, including that Ms. Kler continued to be involved in it.  (See id. ¶¶ 36-40; 91-93.)

But perhaps the most compelling evidence in the record involves the public filings regarding transfers among the corporate entities.  As Plaintiffs explain, Group XIII Properties, LP claims to be a limited partnership owned by Mr. Nijjar and his wife, while DHA Opportunity 1, LP purports to be a limited partnership owned by Ms. Kler.  (Opposition at 17.)  But the evidence in the record suggests that these limited partnerships have represented to county recorders that they are a single entity.  Group XIII Properties, LP has transferred properties to DHA Opportunity 1, LP, representing to the Riverside and San Bernardino County Recorders that the transfers were not subject to a transfer tax because the grantors and grantees were the "same parties."  (PAMF ¶¶ 66-77.)  There is a similar pattern of conduct among other entities controlled by the Nijjar family.  For example, in August 2019, Golden Opportunity No. 17 LP transferred a property to DHA Opportunity 1, LP, claiming the identical "same parties" exemption.  (Id. ¶ 72.)  But according to the public records, the limited partner of Golden Opportunity No. 17 was not Daljit Kler, but Sanjeet Nijjar, son of Swaranjit Nijjar, one of the owners of Nijjar Realty, Inc.  (Id. ¶¶ 72-73.)  The Court need not and does not make such a finding at this juncture, but Plaintiffs have raised a substantial argument that "if the separate corporate nature of the grantors and grantees is respected, these transfers perpetrate a fraud."  (Opposition at 17.)  And there is a similar situation with regard to the transfer of the Villa La Paz apartments, the subject of this action.  According to Plaintiffs, Mr. Nijjar intended to transfer the Villa La Paz apartments to Ms. Kler, making the same representation to the Riverside County Recorder regarding the "same parties" exemption to transfer tax, but that the instant lawsuit "derailed that plan."  (Id. at 18; PAMF ¶¶ 59-65.)  In the January 2, 2019 grant deed, Group XIII Properties, LP transferred title of the Villa La Paz Apartments to DHA Opportunity, LP, though the deed was not recorded.  (PAMF ¶¶ 59-60.)  A second grant deed, dated May 13, 2021 but not notarized until after Plaintiffs served this lawsuit, purported to make the same transfer, noting that no transfer tax was due because the grantor and grantee "are comprised of the same parties who continue to hold the same proportionate interest in the property."  (Id. ¶¶ 60-63.)  That deed was recorded on July 29, 2021, and the next day, the original January 2, 2019 deed was recorded as well, with a handwritten change in title ("'Correction' Grant Deed").  The original, uncorrected January 2, 2019 deed appears to have contained language asserting a $0 Documentary Transfer Tax was due because of an exemption, but that language was whited out in the recorded version.  (Id. ¶ 65.)  Plaintiffs are correct that this raises a legitimate inference that the "circumstances do not reflect an arms-length transaction between two separate corporate entities."  (Opposition at 18.)

Nonetheless, Plaintiffs have presented minimal or no evidence on some of the relevant factors.  There is no evidence of "capitalization that is inadequate to ensure that the business can

meet its obligations," "putting funds into or taking them out of the corporation for personal, not corporate, purposes," "lack of discretion by the allegedly subservient entity," "the holding out by one entity that it is responsible for the debts of another entity," or "the use of one entity's property by another entity as its own." See Pac Gulf Shipping, 992 F.3d at 898. There is no evidence of "commingling of funds and other assets," "inadequate capitalization," or "lack of segregation of corporate records." See Sonora, 83 Cal. App. 4th at 538-39. Even so, the above facts present a persuasive case why this Court might disregard the corporate form of one Nijjar family entity because it is the mere alter ego of another Nijjar corporate entity, providing Plaintiffs made the showing on the second step discussed below. And if that were the question before the Court—whether one relevant Nijjar entity was the alter ego of another relevant Nijjar entity—it is possible, perhaps even likely, that Plaintiffs would have raised at least a genuine issue of material fact sufficient to survive summary judgment. But that is not the issue presented by the MSJ, for Plaintiffs must meet a different burden here: demonstrating that, even if the Nijjar family treats some of its corporate entities as the mere alter ego of one another, that Mr. Nijjar and Ms. Kler disregard the corporate form altogether, such that they can be held *individually* liable.

What is present in the case law cited above holding individuals liable, and what is missing here, are the central factors that indicate the disregard of the corporate form altogether. In Shanghai Automation, 194 F. Supp. 2d, the individuals could be liable as alter egos for their corporate entities in large part because they held themselves out as personally liable for certain company debts and made personal payments for one corporation's debt. Id. at 1002. In Holley v. Crank, 400 F.3d 667, the individual owner was plausibly the alter ego of a corporate entity because he was its sole shareholder, used his personal tax identification number on corporate tax returns, the corporation was "very thinly capitalized," and wholly disregarded corporate formalities in at least one transaction, such that there was evidence that the owner viewed the corporation not as a "distinct entity from himself." Id. at 675. And in Say & Say, 20 Cal. App. 4th 1759, the evidence was overwhelming that any corporate entity was a complete sham, not least the statements of Mr. Shieh, who essentially admitted he had formed it with fraudulent intentions. See id. at 1760-66. Whatever may be said of Moving Defendants' conduct, the reality is that they are not the kind of unsophisticated individual owner-operators upon whom the courts have imposed the "extreme remedy, sparingly used," Sonora, 83 Cal. App. 4th at 836, of alter ego liability. That is because the evidence in the record does not establish that Moving Defendants act as if they are one and the same as the corporate entities they control. They may act like the corporate entities they control are the same as the others, but that is an entirely separate question.

As such, the Court finds that Plaintiffs have presented insufficient evidence to meet their burden of raising a genuine dispute of material fact on the first prong of alter ego liability, "that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." Mesler, 39 Cal. 3d at 300. Plaintiffs bear the burden of proof at trial that Moving Defendants are the alter egos of Pro Management, which employed Ms. Valerio at the time of her alleged tortious conduct, or indeed any of the relevant corporate entities. See Standard Beauty, 561 F.2d at 775; Minifie, 187 Cal. at 488. The evidence

described above is insufficient to raise a genuine issue of material fact because Plaintiffs have failed to make a sufficient showing on an essential element of their case against Moving Defendants.  See Celotex, 477 U.S. at 323.

But Plaintiffs' showing is equally, and perhaps more, deficient on the second step: the need to impose alter ego liability because, in its absence, fraud or some other kind of injustice will result.  See id.  In seemingly all the cases cited above where alter ego liability is appropriate, the reason it is necessary is to allow a plaintiff to recover money damages against the defendant, including an individual, that has assets (or at least more assets) to pay what is owed.  In Holley v. Crank, 400 F.3d 667, the reason that the "equity and fairness of the corporate shield to liability" might be disregarded is that "Triad did not have assets to pay a judgment and that Triad's insurance policy excluded liability for discrimination in the provision of service." Id. at 675.  In Shanghai Automation, 194 F. Supp. 2d 995, alter ego liability may have been appropriate because were the corporate entities "not considered as the alter egos of defendant Kuei, an inequitable result would occur as defendant Kuei would be allowed to shield himself from liability from the conversion and transfer of funds into the[] currently-suspended corporate entities, which are apparently without assets[.]" Id. at 1003.  Here, Plaintiffs make no showing whatsoever that, should they prevail on the merits against any of the entity Defendants in this case, they are insufficiently capitalized such that they need to hold the Moving Defendants personally liable. The sole contention Plaintiffs raise on this point is as follows:

> For years, Nijjar and Kler have successfully relied on their positions as corporate officers to deflect liability for their personal conduct. (PAMF 149-150.)  Here, plaintiffs seek affirmative injunctive relief that will require Nijjar and Kler to operate their business in compliance with the federal and state fair housing laws. Allowing them to escape that liability creates is contrary to the intent of the FHA and FEHA, both of which identify the end of housing discrimination as important public policies.  42 U.S.C. § 3601; Cal. Govt. Code § 12921(b).

(Opposition at 27.)  To begin, the Court seriously doubts that this interest is sufficiently compelling to impose liability on Moving Defendants as individuals, for the corporate entities they control are already required, like any other similarly situated corporation, to comply with fair housing laws.  And even if it were, Plaintiffs do not explain why the same or similar injunctive relief cannot be awarded against the entity Defendants that remain in this lawsuit.

The Court might have reached a different conclusion had Plaintiffs acquired more evidence to bolster their case against Moving Defendants, but as noted above, they did not conduct material discovery, particularly the depositions of Mr. Nijjar and Ms. Kler.  Moreover, none of the above is to suggest that Plaintiffs do not have a compelling case against the entity Defendants.  Should Plaintiffs prevail on the merits against any of these corporate entities, and through some form of financial subterfuge they are unable to satisfy a judgment against any of them, the Court would be willing to consider the imposition of judgment against a different

corporate entity upon a showing that *it* is the alter ego of one of the named entity Defendants. But that is a hypothetical possibility the Court likely never need reach, for there is no indication that any of the named entity Defendants lack sufficient assets to pay a potential judgment.  This is also not to suggest that summary judgment would be appropriate for any of the remaining Defendants, which have not so moved, and for which, based on the evidence cited above, it is difficult to see how they could prevail.  Nonetheless, for the reasons above, the Court finds that Plaintiffs' claim for alter ego liability against Moving Defendants cannot survive summary judgment.

### E.  Direct or Vicarious Liability – Negligence Theory

Plaintiffs' third and final theory of liability is that Moving Defendants can be held directly or vicariously liable under the implementing regulations of the FHA and the FEHA, essentially on a negligence theory.  The FHA regulation they cite, 24 C.F.R. § 100.7 (Liability for Discriminatory Housing Practices) provides:

> (a) Direct liability.
>     (1) A person is directly liable for:
>     (i) The person's own conduct that results in a discriminatory housing practice.
>     (ii) Failing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct.
> . . .
> (b) Vicarious liability. A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law.

24 C.F.R. § 100.7.  Plaintiffs also suggest that the regulations interpreting FEHA are "similar, but broader."  (Opposition at 22.)  The California regulation they cite, Cal. Code Regs. tit. 2, § 12010 (Liability for Discriminatory Housing Practices), states:

> (a) Direct Liability.
>
>     (1) A person is directly liable for:
>     (A) The person's own conduct that results in a discriminatory housing practice.
>     (B) Failing to take prompt action as determined on a case-by-case basis to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct, including

---

**CIVIL MINUTES—GENERAL**

because supervisors, managers, or principals of the person had or
should have had such knowledge.

Cal. Code Regs. tit. 2, § 12010.

Applying these regulations, Plaintiffs argue that Moving Defendants may be held directly
liable because they "knew or should have known of the discrimination" that took place and for
their "failure to take action" despite knowing of a pattern of discriminatory conduct at their
properties over the years. (See Opposition at 24-25.) In sum, Plaintiffs claim that "[r]egardless
of any agency relationship with Valerio, plaintiffs have raised a genuine issue of material fact
whether Nijjar and Kler negligently or recklessly failed to prevent Valerio's discriminatory
housing practices because they had control over the Villa La Paz apartments, knew or should
have known of the potential for discriminatory conduct, but failed to take remedial action[.]"
(Opposition at 25.)

Essentially, Plaintiffs read these regulations as circumventing "traditional agency
principles," even though they actually claim the opposite. (See Opposition at 21.) That is to say,
they believe Moving Defendants may be held personally liable for Ms. Valerio's conduct because
each of the regulations state that a "person is directly liable for" the conduct of certain
individuals under certain circumstances, namely when they knew or should have known about
the discriminatory conduct and failed to address it. Once again, under both the FHA and FEHA,
a "person" might refer equally to an individual, like Moving Defendants, or virtually any kind of
corporate entity, like the corporations they control as owners and directors. See 42 U.S.C. §
3602(d) (defining "person" under FHA); Cal. Gov. Code §§ 12925, 12927(f), 2 Cal. Code Regs
§ 12005(s) (defining person under FEHA). The key question is the agency relationship, which
Plaintiffs correctly note is one of fact. See Harris v. Itzhaki, 183 F.3d 1043, 1054 (9th Cir. 1999).
What Plaintiffs ignore is that it is the "*corporation, not its owner or officer*, who is the principal or
employer, and thus subject to vicarious liability for torts committed by its employees or agents."
Meyer, 527 U.S. at 286 (emphasis added). Under Plaintiffs' reading of these regulations, a
"person" like Moving Defendants is *personally liable* as a corporate director or owner if he or she
knew of, or should have known, about the pattern of discriminatory conduct but failed to address
it. The Court affords these regulations deference. See Itzhaki, 138 F.3d at 1054; Mogilefsky
v. Superior Court, 20 Cal. App. 4th 1409, 1417 n.4 (1993). But no amount of deference would
lead to Plaintiffs' reading of them, because that is not what the agencies intended when they
promulgated these rules.

Thankfully, at least one court has already explained why the federal regulation cited above
does not purport to do what Plaintiffs say it does, which would effectively overrule the holding of
Meyer, 537 U.S. 280, in dismissing claims against an individual defendant:

"Section 100.7 does not create liability that does not already
exist," HUD explained when promulgating 24 C.F.R. § 100.7. See
Quid Pro Quo and Hostile Environment Harassment and Liability
for Discriminatory Housing Policies Under the Fair Housing Act,

81 Fed. Reg. 63054-01, 63067 (Sept. 14, 2016).  Section 100.7(a)(1)(iii) creates neither new nor enhanced liability for housing providers.  Id. at 63069. . . . Moreover, Section 107(a)(1)(iii) clarifies that "a *housing provider* is liable under the Fair Housing Act for third-party conduct if the provider knew or should have known of the discriminatory conduct, has the power to correct it, and failed to do so."  Id. at 63068 (emphasis added).

When examined as a whole, these regulations offer no basis to impute direct liability to Fruen in his individual capacity.  To begin, Section 100.7(b) codifies federal vicarious liability law, holding a principal vicariously liable for the acts of its agents regardless of whether the principal knew of the agent's conduct.  See Meyer, 537 U.S. at 286 ("[I]n the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for a tort committed by its employees or agents.").  A principal is directly liable when the principal or employer knew or should have known of the agent's or employee's conduct.  24 C.F.R. § 107(a)(1)(ii).  Section 100.7(a)(1)(iii) simply extends the concept of direct liability embodied in Section 100.7(a)(1)(ii) to the discriminatory conduct of non-employees or non-agents, such as a tenant-to-tenant harassment if the housing provider has the power to correct the discriminatory conduct.  Section 107(a)(1)(iii) does not expand the universe of persons who may be directly liable—housing providers.  Rather, Section 107(a)(1)(iii) expands the universe of persons whose conduct a housing provider may be directly liable for failing to control.  Such reasoning is consistent with HUD's statement that Section 107 does not create new or enhanced liability; rather, it reflects existing law. . . .

Plaintiffs' amended complaint identifies Pfeiffer as the manager and landlord of both the Maryland Avenue Property and the Nicollet Avenue Property.  Because MFP and F&P are both the owners of the properties and Pfeiffer's employer, MFP and F&P may be held directly liable for failing to take prompt action to correct and end a discriminatory housing practice by a third-party if MFP and F&P knew or should have known of the discriminatory conduct and also had the power to correct it.  But the potential liability of MFP and F&P does not implicate direct liability for Fruen in his individual capacity.

Brown v. Pfeiffer, 2020 WL 6146614, at *3–4 (D. Minn. Oct. 20, 2020).  As noted by Brown, HUD carefully explained that its rule was consistent with traditional agency principles and the

holding of Meyer, 537 U.S. 280, including addressing the commenters who were concerned that the rule might be read more or less as Plaintiffs read it: to impose liability on corporate directors, officers or officers on the basis of an employee's actions, when that employee works for the corporation, not the individuals.  HUD affirmed it did not seek to impose any such liability.  See Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 FR at 63072.

The limited case law applying 24 C.F.R. § 100.7 all appears to follow these same principles.  In Johnson v. Brenneke, 2022 WL 981295 (D. Or. Feb. 23, 2022), report and recommendation adopted, 2022 WL 980879 (D. Or. Mar. 31, 2022), the court applied the regulation in assessing a plaintiff's claim regarding disability-related harassment.  See id. at *5.  But first it granted summary judgment for the individual defendant Thomas Brenneke, for whom the undisputed facts showed that he had no personal interactions with the plaintiff and his purported liability stemmed "exclusively from his ownership interest" in the limited liability companies that provided housing to the plaintiff.  See id. at *4.  As part of its extensive discussion of liability under Section 100.7, Harris v. Vanderburg, 584 F. Supp. 3d 82 (E.D.N.C. 2022) affirmed that "[w]hen a collective entity is involved, the FHA imposes liability on the collective entity but not on its officers or owners."  Id. at 94; accord Wetzel v. Glen St. Andrew Living Cmty., LLC, 901 F.3d 856, 864-65 (7th Cir. 2018) (affirming that the FHA "imposes vicarious liability on a corporation, but not upon its officers or owners" but that there could be direct liability imposed on the management defendants, the individuals directly involved in "standing pat as Wetzel reported the barrage of harassment").

Although there is even less case law applying the California regulation, the Court sees no reason why the result would be different.  The sole relevant case Plaintiffs cite as to their theory of "negligent nonfeasance" liability against directors and officers is Frances T. v. Vill. Green Owners Assn., 42 Cal. 3d 490 (1986).  That case reaffirmed all the central principles cited above, namely:

> It is well settled that corporate directors cannot be held vicariously liable for the corporation's torts in which they do not participate. Their liability, if any, stems from their own tortious conduct, not from their status as directors or officers of the enterprise. . . . "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct."

Id. at 580 (internal citations omitted).  It went on to state that a tort claim could be brought against directors in their personal capacity when they "specifically knew or reasonably should have known that some hazardous condition or activity under their control could injure plaintiff [and] they negligently failed to take or order appropriate action to avoid the harm."  Id. at 583-84.

In <u>Frances T.</u>, the plaintiff was raped and robbed in her condominium unit, while at the time of the attack, her unit had no exterior lighting; she brought suit against, among other defendants, the individual members of the condominium association's board of directors. <u>Id.</u> at 574. On the facts alleged, the California Supreme Court thus found a sufficient basis for liability against directors, because they had "specific knowledge of a hazardous condition threating physical injury to the residents, yet they failed to take any action to avoid the harm; moreover, the action they did take may have exacerbated the risk by causing plaintiff's unit to be without any lighting on the night she was attacked." <u>Id.</u> at 584. Critically, the directors "took affirmative action that made the break-in more likely when they ordered [the plaintiff] to immediately disconnect the lighting she had installed to protect herself from the foreseeable risk of another criminal break-in." <u>Id.</u> The directors did this despite being aware of a "crimewave" and that the plaintiff had installed the lighting to protect herself. <u>Id.</u> at 585. Moreover, the individual directors had actual knowledge of the criminal activity afoot, but failed to do anything about it for six months. <u>Id.</u> As such, the plaintiff had alleged that "each of the directors participated in the tortious activity" such that she stated a claim against them. <u>Id.</u> at 586.

<u>Frances T.</u> does not support Plaintiffs' sweeping theory of negligence liability against individual corporate owners or directors. It concerned a narrow and extreme situation in which the individual directors acted so recklessly that their decision-making actually "*increased* the risk of harm and was the legal cause of plaintiff's injuries." <u>Id.</u> at 585 (emphasis in original). As such, their conduct fell within the ambit of corporate director liability for *personal participation* in tortious conduct. <u>Id.</u> at 586. But here it is undisputed that Moving Defendants did not personally participate in Ms. Valerio's alleged tortious conduct and did not have specific knowledge of Mr. Beasley's application or how it was processed. (DSSUF ¶¶ 6-7.) It may very well be the case that Mr. Nijjar and Ms. Kler saw nothing wrong in what Ms. Valerio did, that they have created a culture of racial discrimination across their property empire, that they knew about a culture of racial discrimination and failed to address it, and so forth—all theories and inferences Plaintiffs suggest in the Opposition. (<u>See</u> Opposition at 23-25.) But the reality is they have no direct evidence linking Moving Defendants to the specific tortious conduct at issue in this case.

Perhaps Plaintiffs could have asserted a claim that Ms. Nijjar is liable as a supervisory employee in a management role, namely that she was personally responsible for supervising individuals like Ms. Valerio and ratified or overlooked her tortious conduct. But Plaintiffs have not raised such a theory, seemingly in large part because they have discovered no direct evidence that Ms. Kler is involved in the details of Pro Management's operations; Pro Management is the entity that employed Ms. Valerio. That is, once again, because Plaintiffs did not acquire the relevant records from Pro Management in discovery and failed to depose Ms. Kler (or Mr. Nijjar.) At best, Plaintiffs have provided evidence that a manager at Pro Management, Joaquin Rodriguez, met Ms. Kler one time at the Pro Management office and attended a resident managers' meeting another time with Ms. Kler. (<u>See</u> PAMF ¶¶ 91-93.) They have submitted no evidence that Ms. Kler had even met Ms. Valerio before or after she allegedly discriminated against Mr. Beasley. They have submitted no direct evidence that Ms. Kler was responsible for

supervising or disciplining Ms. Valerio, or Pro Management employees like her.  Those would have been obvious topics to pursue at her deposition, but none was taken.

For these reasons, the Court finds summary judgment appropriate on Plaintiffs' third theory of liability as well.

## F.  Punitive Damages

Because the Court rejects all three of Plaintiffs' theories of individual liability against Moving Defendants, and because Mr. Nijjar and Ms. Kler are thus entitled to judgment as a matter of law on the issue of whether they can be held liable as individuals in this action, the Court GRANTS the MSJ and DISMISSES Mr. Nijjar and Ms. Kler as Defendants.

Punitive damages are available under the FHA against an employer "for the conduct of his agent when the record shows that he was, 'by action or knowledgeable inaction, involved in the wrongdoing,' . . . or that he has 'authorized, ratified, or fostered the acts complained of.'" Miller v. Apartments & Homes of New Jersey, Inc., 646 F.2d 101, 111 (3d Cir. 1981).  Because Plaintiffs cannot establish an agency relationship between Ms. Valerio and Moving Defendants in their individual capacity, or that Mr. Nijjar or Ms. Kler were directly involved in Ms. Valerio's alleged wrongdoing or authorized or ratified it, punitive damages are not available against them in their individual capacity.  The Court DISMISSES Plaintiffs' allegations of, and prayer for, punitive damages in the FAC against Mr. Nijjar and Ms. Kler as individuals.

## V.   CONCLUSION

For the reasons above, the Court **GRANTS** the MSJ and enters summary judgment for Moving Defendants on all Plaintiffs' claims against them.  Mr. Nijjar and Ms. Kler are **DISMISSED** from the FAC, along with the allegations of and prayer for punitive damages against them as individuals.  The May 1, 2023 hearing is **VACATED.**

**IT IS SO ORDERED.**